903 F.2d 1385
 1990-1 Trade Cases 69,070
 Dennis W. AUSTIN, Individually and as representatives of the
Plaintiff's Class; and Ernest D. Woodall, Jr.,
Individually and as representative of
the Plaintiff's Class,
Plaintiffs-Appellants,
v.
BLUE CROSS AND BLUE SHIELD OF ALABAMA, a corporation,
Defendant-Appellee.
 No. 88-7406.
 United States Court of Appeals,
Eleventh Circuit.
 June 22, 1990.
 
 1
 C. Knox McLaney, III, Montgomery, Ala., Jerry R. Knight, Decatur, Ala., for plaintiffs-appellants.
 
 
 2
 Robert D. Eckinger, Lange, Simpson, Robinson & Somerville, Birmingham, Ala., for defendant-appellee.
 
 
 3
 Appeal from the United States District Court for the Middle District of Alabama.
 
 
 4
 Before RONEY and HILL, Senior Circuit Judges*, and MARCUS**, District Judge.
 
 
 5
 MARCUS, District Judge.
 
 
 6
 Dennis W. Austin and Ernest D. Woodall, Jr. appeal from the June 7, 1988 district court order dismissing their Amended Complaint on the finding that Appellants lacked antitrust standing to bring this action. We find no error in the district court's determination and accordingly we affirm.
 
 I.
 
 7
 This action arose out of allegations contained in Appellants' Amended Complaint filed in the United States District Court for the Middle District of Alabama. In their Amended Complaint, Austin and Woodall, residents of Decatur, Alabama, allege that Blue Cross and Blue Shield of Alabama ("Blue Cross") entered into contracts, combinations or conspiracies with all, or substantially all, of the hospitals in the state of Alabama for the purpose of creating or maintaining a monopoly or for the purpose of eliminating, lessening, discouraging, or impeding competition from others engaged in the health, medical and hospital insurance business. The Amended Complaint further charges that the Defendant and the hospitals, including the Decatur General Hospital and the Huntsville Hospital, engaged in certain illegal acts and practices. The Amended Complaint claims that agreements reached between Blue Cross and the hospitals wrongfully provided for the hospitals to accept payments for services rendered from Blue Cross, on behalf of its insured, in amounts lower than charges which the hospitals assessed to patients insured by competitors of Blue Cross and patients who do not subscribe to health insurance for like services. Appellants say that the agreements between Blue Cross and the hospitals caused the hospitals to engage in a practice known as "cost shifting," a process whereby patients insured with other insurance companies as well as uninsured patients are assessed charges higher than they would be assessed but for the alleged preferential treatment given to Blue Cross and its insured pursuant to the alleged agreements. It is further charged that the agreements put Blue Cross in a superior competitive position by giving Blue Cross a decided actuarial advantage over its competitors. The Appellants claim that Blue Cross' actions in allegedly entering into agreements regarding price concessions with the hospitals violate both Sections 1 and 2 of the Sherman Act, Title 15 U.S.C. Secs. 1, 2.
 
 
 8
 Appellant Austin charges specifically that his wife and newborn child incurred substantial medical expenses at Decatur General Hospital and Huntsville Hospital during the months of December 1986 and March 1987. While Dennis Austin and his dependents were covered by a health, medical and hospital insurance policy issued by Time Insurance Company--not a party to the law suit--Austin was responsible for certain uncovered hospital expenses as well as a twenty percent co-payment for costs which were covered under the policy. Austin claims that due to "cost shifting" engaged in by the hospitals as a result of agreements reached with Blue Cross, he was forced to pay inflated charges for the health care received by his wife and child.
 
 
 9
 Appellant Ernest D. Woodall, Jr. claims to have been treated at the Emergency Room of Decatur General Hospital at various times during 1985 and 1986. He charges that he was not covered by health, medical or hospital insurance during the period in which he received treatment and that he, too, incurred inflated charges for hospital services due to the "cost shifting" practices engaged in by the hospital. The Amended Complaint sought declaratory and injunctive relief as well as treble damages for the purported violations of the Sherman Act.
 
 
 10
 On March 4, 1988, Appellee moved to dismiss based on the lack of antitrust standing. Appellants responded on March 30, 1988, and on June 7, 1988 the district court granted the motion to dismiss finding that Austin and Woodall lacked "antitrust standing." This appeal ensued.
 
 II.
 
 11
 The question of standing to sue under the Sherman and Clayton Acts is one of law. Midwest Communications v. Minnesota Twins, 779 F.2d 444, 449 (8th Cir.1985), cert. denied, 476 U.S. 1163, 106 S.Ct. 2289, 90 L.Ed.2d 730 (1986). In order to determine whether a plaintiff has standing to bring an antitrust action, a court must review the allegations contained in the complaint. Pan-Islamic Trade Co. v. Exxon Corp., 632 F.2d 539, 547 (5th Cir.1980), cert. denied, 454 U.S. 927, 102 S.Ct. 427, 70 L.Ed.2d 236 (1981); In Re Beef Industry Antitrust Litigation, 600 F.2d 1148, 1168 (5th Cir.1979). More than constitutional standing must exist; "the court must find a close relationship between the plaintiff's injury and the alleged antitrust violation." Amey, Inc. v. Gulf Abstract & Title, Inc., 758 F.2d 1486, 1493 (11th Cir.1985), cert. denied, 476 U.S. 1153, 106 S.Ct. 2267, 90 L.Ed.2d 712 (1986).
 
 
 12
 Section 4 of the Clayton Act, 15 U.S.C. Sec. 15, defines very broadly the class of persons who may bring a private damage action under the antitrust laws. That section provides:
 
 
 13
 Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.
 
 
 14
 The Supreme Court has observed that "[a] literal reading of the statute is broad enough to encompass every harm that can be attributed directly or indirectly to the consequences of an antitrust violation." Associated General Contractors v. Carpenters, 459 U.S. 519, 529, 103 S.Ct. 897, 903, 74 L.Ed.2d 723 (1983). However, in Associated General Contractors, the Court rejected so expansive a reading of Sec. 4 noting that the question of whether a plaintiff can recover for alleged antitrust injuries "cannot be answered simply by reference to the broad language of Sec. 4. Instead ... the question requires us to evaluate the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them." Id. at 535, 103 S.Ct. at 907. It is clear that "the judicial remedy [of Sec. 4] cannot encompass every conceivable harm that can be traced to alleged wrongdoing" Id. at 537, 103 S.Ct. at 908. See also Hawaii v. Standard Oil Co., 405 U.S. 251, 263, n. 14, 92 S.Ct. 885, 891, n. 14, 31 L.Ed.2d 184 (1972) ("The lower [federal] courts have been virtually unanimous in concluding that Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation"); Southhaven Land Co. v. Malone & Hyde, Inc., 715 F.2d 1079, 1081 (6th Cir.1983) ("[A]pplication of Section 4 has of necessity been judicially confined to limit the remedy available thereunder to particular classes of persons and for redress of particular forms of injury.")
 
 
 15
 The federal courts have long struggled to develop a precise test to determine whether a party alleged to have been injured by an antitrust violation may recover treble damages. This struggle has been compared with "the struggle of common-law judges to articulate a precise definition of the concept of 'proximate cause' ". Associated General Contractors, 459 U.S. at 535-36, 103 S.Ct. at 907. In Associated General Contractors, the Supreme Court recognized the impracticality inherent in the application of a "black-letter rule" to determine whether a plaintiff has standing to recover for an antitrust violation. Id. at 536, 103 S.Ct. at 907. In doing so, the Court suggested that the use of formulations such as the "direct injury" test and the "target area" test may tend to "lead to contradictory and inconsistent results." Rather, the Court observed, "[i]n our view, courts should analyze each situation in light of the factors set forth in the text...." Id. at 536, n. 33, 103 S.Ct. at 907, n. 33.
 
 
 16
 Associated General Contractors involved a union's claim that an association of contractors coerced third parties and other members of the contractor's association into avoiding business relationships with union contractors and subcontractors. In determining that the union lacked standing to bring an action under the Clayton Act, the Supreme Court declined to apply a rigid test to resolve the standing issue. Instead, the Court applied the following battery of factors to reach its conclusion: 1) the existence of a causal connection between the antitrust violation and the alleged injury; 2) the nature of plaintiff's alleged injury; 3) the directness or indirectness of the asserted injury and the related inquiry of whether the damages are speculative; 4) the potential for duplicative recovery or complex apportionment of damages; and, finally, 5) the existence of a more direct victim of the alleged anti-competitive conduct. Id. at 536-45, 103 S.Ct. at 907-12. See also Amey, Inc. v. Gulf Abstract & Title, Inc., 758 F.2d 1486, 1494-95 (construing factors employed in Associated General Contractors ). The Court noted that the foregoing factors are reflective of "previously decided cases [which] identify factors that circumscribe and guide the exercise of judgment in deciding whether the law affords a remedy in specific circumstances." Associated General Contractors at 536-37, 103 S.Ct. at 908.
 
 
 17
 Subsequent to the Supreme Court's decision in Associated General Contractors, this Court reaffirmed its employment of the target area test in determining standing under the Clayton Act. See Amey, 758 F.2d at 1496-97; Pallazo v. Gulf Oil Co., 764 F.2d 1381, 1387 (11th Cir.1985), cert. denied, 474 U.S. 1058, 106 S.Ct. 799, 88 L.Ed.2d 775 (1986). In National Independent Theatre Exhibiters v. Bueno Vista Distribution Co., 748 F.2d 602-08 (1984), cert. denied sub. nom., Patterson v. Buena Vista Distributing Co., 474 U.S. 1013, 106 S.Ct. 544, 88, L.Ed.2d 473 (1985), this Court expounded on the requirements for standing in a private antitrust action:
 
 
 18
 Standing to prosecute a private antitrust action under section 4 of the Clayton Act requires the plaintiff to prove that "he is within that sector of the economy which is endangered by a breakdown of competitive conditions in a particular industry." Jeffrey v. Southwestern Bell, 518 F.2d 1129, 1131 (5th Cir.1975). See Construction Aggregate Transport Inc. v. Florida Rock Industries, Inc., 710 F.2d 752, 762 (11th Cir.1983). The plaintiff must be the target against which anticompetitive activity is directed. Midwestern Waffles, Inc. v. Waffle House, Inc., 734 F.2d 705, 710 (11th Cir.1984); Pan-Islamic Trade Corp. v. Exxon Corp., 632 F.2d 539, 546-47 (5th Cir.1980), cert. denied, 454 U.S. 927, 102 S.Ct. 427, 70 L.Ed.2d 236 (1981). The injury must be "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' act unlawful." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). "Incidental or consequential injury or injury remotely caused by an antitrust violation does not give a plaintiff standing to complain that he has been injured by reason of anything forbidden in the anti-trust laws." Midwestern Waffles, 734 F.2d at 710-11. See Jeffrey, 518 F.2d at 1131 (citing cases)
 
 
 19
 In Amey, this Court observed that the target area test does not produce results materially different from the results obtained by applying the factorial analysis embodied in Associated General Contractors. Indeed, the target zone test incorporates the factors delineated in Associated General Contractors. See Amey, 758 F.2d at 1496-97. Measured by any of these standards Appellants have not established antitrust standing.
 
 III.
 
 20
 To begin, a review of the Amended Complaint establishes, as the district court observed, that the causal connection between Plaintiffs' injuries and Blue Cross' alleged misconduct is at best remote and tenuous. The Complaint alleges only that the hospitals and Blue Cross entered into contracts for the provision of hospital services to Blue Cross and its insured or subscribers; that as a result of these contracts, Blue Cross receives hospital services for its subscribers at rates more favorable than those received by competing health insurers and uninsured patients; that because of favorable rates given to Blue Cross, the hospitals charge competing insurers and other patients more than is paid by Blue Cross ("cost shifting"); and, finally that this practice of "cost-shifting" results in Blue Cross' competitors and uninsured patients paying more for services.
 
 
 21
 The Complaint does not allege, however, that the contracts between Blue Cross and the hospitals say anything at all as to the rates the hospitals charge to other purchasers. There is no claim that Blue Cross plays any role in the decisions of the hospitals to set various rates for others. Indeed, there is no claim that Blue Cross in any way coerced the hospitals to charge non-Blue Cross customers higher rates than those charged to Blue Cross customers. Nor, finally, is there any claim that Blue Cross conspired with the hospitals to engage in any predatory pricing. It is important to observe that the only allegations of "cost shifting" contained in the Complaint are limited to actions purportedly taken by the hospitals. In short, the Appellants have made no real showing of a causal connection between their injury and Blue Cross' alleged antitrust violation. The connection is indirect and collateral.
 
 
 22
 In the second place, whether measured by the factors delineated in Associated General Contractors or by the target area test, the plaintiffs have not alleged injuries brought about by a violation of the antitrust laws. Both causation and antitrust injury are essential elements of antitrust standing. In Brunswick Co. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), the Supreme Court held that in order to receive damages under the antitrust laws, a plaintiff must prove more than the fact that he was injured through conduct of the defendant. The "[p]laintiff[ ] must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." Id. at 489, 97 S.Ct. at 697 (emphasis original). Moreover, "[t]he injury should reflect the anticompetitive effect either of the violation or of anticompetive acts made possible by the violation." Id. "The antitrust laws ... were enacted for 'the protection of competition, not competitors '[.]" Id. at 488, 97 S.Ct. at 697 (emphasis original) (citing Brown Shoe Co. v. United States, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962)).
 
 
 23
 The rationale for placing so great an emphasis on antitrust injury as the touchstone for antitrust standing has been offered in these terms:
 
 
 24
 The antitrust injury concept ... requires the private antitrust plaintiff to show that his own injury coincides with the public detriment tending to result from the alleged violation. This requirement increases the likelihood that public and private enforcement of the antitrust laws will further the same goal of increased competition.
 
 
 25
 P. Areeda and H. Hovenkamp, Antitrust Law, 335.1, at 261 (Supp.1987).
 
 
 26
 Accordingly, Appellants must show that the contractual agreements between Blue Cross and the hospitals as alleged are anticompetitive. Framed more precisely, at issue is whether, standing alone, Blue Cross' use of its market power to gain lower rates for its subscribers from hospitals violates the Sherman Act.
 
 
 27
 In Travelers Insurance Company v. Blue Cross of Western Pennsylvania, 481 F.2d 80 (3rd Cir.1973), cert. denied, 414 U.S. 1093, 94 S.Ct. 724, 38 L.Ed.2d 550 (1973), the Third Circuit was faced with a case of striking similarity to the instant one. In Travelers, a competing insurance company brought an action under Sec. 1 of the Sherman Act alleging that Blue Cross of Pennsylvania had restrained trade and monopolized and attempted to monopolize the health care industry in Western Pennsylvania through the negotiation of favorable health care rates with hospitals. Travelers claimed that Blue Cross had monopoly power with some 62% of the market, and that it used that power to obtain hospital rates for approximately 14% to 15% below the rates charged to non-Blue Cross purchasers. As in the instant case, there were no allegations in Travelers that Blue Cross had attempted to influence relationships between hospitals and other health insurance companies. Id. at 84.
 
 
 28
 The Travelers Court analyzed whether the complaint alleged sufficient facts to constitute a claim for damages resulting from a violation of Secs. 1 and 2 of the Sherman Act. After assuming, arguendo, that Blue Cross possessed sufficient market strength to have "monopoly power," the Court observed:
 
 
 29
 In its negotiating with hospitals, Blue Cross has done no more than conduct its business as every rational enterprise does, i.e., get the best deal possible. This pressure encourages hospitals to keep their costs down; and, for its own competitive advantage, Blue Cross passes along the saving thus realized to consumers. To be sure, Blue Cross' initiative makes life harder for commercial competitors such as Travelers. The antitrust laws, however, protect competition, not competitors; and stiff competition is encouraged, not condemned.
 
 
 30
 Id. The Court concluded that Blue Cross' use of market power to obtain discounts for its customers from hospital providers did not constitute a restraint of trade or the willful acquisition or maintenance of monopoly power. Efforts to obtain lower prices for subscribers are not anti-competitive. A similar conclusion was reached by the First Circuit in Kartell v. Blue Shield of Mass., Inc., 749 F.2d 922 (1st Cir.1984), cert. denied, 471 U.S. 1029, 105 S.Ct. 2040, 85 L.Ed.2d 322 (1985). The Kartell Court found no right of action under the Sherman Act under circumstances similar to the instant case, holding that pricing agreements between an insurance company and participating physicians do not represent a restraint of trade or monopolization.
 
 
 31
 Applying these principles to the facts of the instant case yields a straightforward result. Here, the allegations fail to charge actions on the part of the Appellee which would constitute a violation of antitrust law if proved. The Appellants' Amended Complaint alleges that the Appellee
 
 
 32
 entered into contracts, combinations or conspiracies with all, or substantially all, of the entities operating hospitals in the State of Alabama for the purpose of creating or maintaining a monopoly or monopoly power or for the purpose of eliminating, lessening, discouraging or impeding competition from others engaged in the health, medical and hospital insurance business.
 
 
 33
 Amended Complaint at para. 7. The Amended Complaint further alleges that
 
 
 34
 Pursuant to the aforesaid contracts, combinations or conspiracies, the various hospitals accept from the Defendant, in behalf of its insured, in full settlement and discharge of the accounts for services rendered to the Defendant's insured amounts lower than the standard charges assessed for services rendered to persons insured by insurers in competition with the Defendant and to private patients or uninsured persons[.]
 
 
 35
 Amended Complaint at para. 8(a).
 
 
 36
 An examination of these allegations reveals that the Appellants, like the plaintiffs in Travelers, have merely charged Appellee with using its market power to bargain for the lowest possible price for services provided to its customers. Again, we observe that Appellants do not allege that the Appellee in any way coerced the hospitals to charge non-Blue Cross customers higher rates than those charged to Blue Cross customers. Moreover, there is no claim that Blue Cross conspired with the hospitals to engage in predatory pricing. There is no suggestion that the hospitals priced their services below average variable cost, see International Air Industries, Inc. v. American Excelsior Co., 517 F.2d 714, 722 (5th Cir.1975), cert. denied, 424 U.S. 943, 96 S.Ct. 1411, 47 L.Ed.2d 349 (1976), or below total cost, see McGahee v. Northern Propane Gas Company, 858 F.2d 1487 (11th Cir.1988), cert. denied, --- U.S. ----, 109 S.Ct. 2110, 104 L.Ed.2d 670 (1988), or that any "cost-shifting" by the hospitals was either required by or approved of by the Blue Cross contracts, or, finally, that Blue Cross acted as if it were a "third force" intervening in the market place in such a way as to prevent willing buyers and sellers from "independently" coming together to strike bargains as to price and service. See Kartell, supra, 749 F.2d at 924.
 
 
 37
 In short, we can find no allegations in the Amended Complaint which support the conclusion that the agreements between Blue Cross and the hospitals amount to a restraint of trade. Rather, the agreements actually promote competition within the relevant health care market by allowing Blue Cross to charge lower rates to its subscribers resulting from a reduction in the cost of health care services which it purchases from hospitals. To the extent competitors seek to compete successfully with Blue Cross, they will be required to lower their rates or improve the benefits offered to subscribers. We are unable to see how Blue Cross' action in simply entering into agreements with hospitals to reduce costs restrained trade in violation of Section 1 of the Sherman Act. We underscore again that we are not called on to consider any allegations that the contracts either contemplated or provided for "cost-shifting," or that they in any way restrained or interfered with any other persons or insurance companies who may purchase services from the hospitals.
 
 
 38
 The Amended Complaint also alleges that the agreements constitute monopolization in violation of Sec. 2 of the Sherman Act. In United States v. Grinnell Co., 384 U.S. 563, 570-571, 86 S.Ct. 1698, 1703-04, 16 L.Ed.2d 778 (1966), the Supreme Court defined the offense of monopoly under Sec. 2 of the Sherman Act as consisting of two elements:
 
 
 39
 (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.
 
 
 40
 In the instant case, even assuming that Blue Cross possessed monopoly power within the relevant market, we can find no violation of Sec. 2 of the Sherman Act and no indication of antitrust injury. In light of our finding that the agreements between Blue Cross and the hospitals do not represent a restraint of trade, we have little trouble concluding likewise that Appellants have not established any antitrust injury arising from allegations of monopolization. Again, the complained of conduct arises from Blue Cross' ability to provide a superior product, namely health coverage at lower rates than its competitors. See Travelers, 481 F.2d at 85 (finding no violation of Sec. 2 of the Sherman Act in the face of essentially the same allegations as the allegations contained in the Amended Complaint). In short, Appellants have not shown antitrust injury.
 
 
 41
 In the third place, we observe that neither of the Appellants dealt directly with Blue Shield, suggesting the remoteness of Appellants injury from any purported antitrust violation. The Amended Complaint only alleges that most of Austin's medical expenses were covered through a policy issued by Time Insurance Company, notably not a party to this action. It is also claimed that Austin was required to pay some medical bills directly to the hospital. The Amended Complaint also states that Woodall was not covered by health insurance and all charges incurred for his medical treatment were owed directly to the hospital.
 
 
 42
 In Illinois Brick Co. v. Illinois, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), the Supreme Court addressed the issue of whether plaintiffs asserting "pass-on" damages have standing to bring an action under Sec. 4 of the Clayton Act. Illinois Brick arose out of a lawsuit brought by a large group of government entities located within the State of Illinois. Antitrust injury was premised on the contention that the Defendant brick manufacturers had conspired to engage in price-fixing, thus raising the price of cement bricks and eventually leading to inflation of the prices paid for finished buildings by the government entities. As the Court noted, the Plaintiffs were "indirect purchasers of concrete block, which passes through two separate levels in the chain of distribution before reaching [the Plaintiffs]. The block [was] purchased directly from petitioners by masonry contractors and used by them to build masonry structures; those structures [were] then incorporated into entire buildings by general contractors and sold to [the Plaintiffs]." Id. at 726, 97 S.Ct. at 2064. In finding that the government entities lacked standing to bring an antitrust action under Sec. 4, the Court held that where potential plaintiffs include both direct purchasers and indirect purchasers only the direct purchasers have standing to bring an action under Sec. 4. The Court concluded:
 
 
 43
 [T]he legislative purpose in creating a group of "private attorneys general" to enforce the antitrust laws under Sec. 4 is better served by holding direct purchasers to be injured to the full extent of the overcharge paid by them than by attempting to apportion the overcharge among all that may have absorbed a part of it. Id. at 746, 97 S.Ct. at 2075. (Citation omitted)
 
 
 44
 Here, Appellants base their claims for damages upon the contention that the "cost shifting" practices of the hospitals resulted in the hospital charging them inflated prices for medical services. These claims essentially constitute pass-on claims proscribed by Illinois Brick. Neither Woodall nor Austin was in privity with Blue Cross. Their claims are wholly derivative in that Appellants assert their costs were inflated only as a result of the hospitals' alleged "cost shifting." The Appellants are at least one step removed from the antitrust violation.
 
 
 45
 Appellants argue, however, that Illinois Brick does not apply because they dealt directly with the hospitals which are alleged to be co-conspirators with Blue Cross. However in In Re Beef Industry Litigation, 600 F.2d 1148, 1163 (5th Cir.1979), the former Fifth Circuit found that the effect of the Illinois Brick prohibition of pass-on damage claims cannot be avoided by a plaintiff's assertion that it had direct dealings with an alleged co-conspirator who is not joined as a defendant in the action.
 
 
 46
 Closely related to the proscription of pass-on damages is the principle that antitrust standing is lacking under Sec. 4 of the Clayton Act where the antitrust injury alleged is remote and highly speculative. The Supreme Court has on several occasions pointed to indirectness and speculativeness of asserted injury as indicia for finding no standing. See, e.g., Associated General Contractors, 459 U.S. at 543-44, 103 S.Ct. at 911; Blue Shield of Virginia v. McCready, 457 U.S. 465, 476-77, 102 S.Ct. 2540, 2546-47, 73 L.Ed.2d 149 (1982).
 
 
 47
 In the present case, the claimed antitrust injuries are extremely remote from the actions complained of. The allegations rely on a theory that the hospitals have somehow charged higher rates to the Appellants and insurers other than Blue Cross based on price concessions to Blue Cross. Such allegations require an evaluation not only of the actions taken by Blue Cross but also an evaluation of the reaction of the hospitals, who were not joined as co-Defendants, to the price-fixing allegedly engaged in by the Appellee. The indirect nature of the Appellants' injury claims squarely "implicates the strong interest ... in keeping the scope of complex antitrust trials within judicially manageable limits." Associated General Contractors, 459 U.S. at 543, 103 S.Ct. at 911. If the Appellants have standing in this case, and the Appellee was found to be liable on these claims, determination of antitrust damages would require the construction of complex and highly speculative economic models. The economic questions requiring determination would surely include, among others, the precise extent to which the hospitals charges directly billed to Austin and Woodall were increased to compensate for concessions made to Blue Cross and the degree to which the "cost shifting" derivatively effected the premiums charged by Austin's insurer. Effective employment of the antitrust remedy provided by Sec. 4 of the Clayton Act requires that these law suits not be weighed down with "massive evidence and complicated theories." See Illinois Brick, 431 U.S. at 741, 97 S.Ct. at 2072 (citing Hanover Shoe v. United Shoe Machine Co., 392 U.S. 481, 493, 88 S.Ct. 2224, 2231, 20 L.Ed.2d 1231 (1968)). The speculativeness of Appellants' claims militates still further in favor of the conclusion that Appellants lack antitrust standing.
 
 IV.
 
 48
 In short, we find that Appellants lack antitrust standing to sue under Sec. 4 of the Clayton Act because of the remote and tenuous connection between Appellants' injuries and Blue Cross' conduct, the failure to allege antitrust injury, the application of the Illinois Brick doctrine, and the abstract and speculative nature of Appellants' claimed injuries. Accordingly the district court's order of dismissal is AFFIRMED.
 
 
 
 *
 See Rule 34-2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit
 
 
 **
 Honorable Stanley Marcus, U.S. District Judge for the Southern District of Florida, sitting by designation