Linda DAVIS, David Efron, Linda Martens, and Genevieve Williams, individually and on behalf of all others similarly situated, Plaintiffs,

v.

SOUTHERN BELL TELEPHONE & TELEGRAPH COMPANY, a Georgia corporation, Defendant.

No. 89–2839–Civ.

United States District Court, S.D. Florida.

Feb. 4, 1991.

Jesse C. Jones, Guy B. Bailey, Jr., Bailey & Hunt, P.A., Miami, Fla., Anne K. Bingaman, Powell, Goldstein, Frazer & Murphy, Washington, D.C., for plaintiffs.

Richard M. Leslie, Maxine M. Long, Shutts & Bowen, Harris R. Anthony, Gary

S. Franklin, Southern Bell Tel. & Tel. Co., Miami, Fla., for defendant.

## ORDER GRANTING PARTIAL SUMMARY JUDGMENT

NESBITT, District Judge.

THIS CAUSE comes before the Court upon the motion of Defendant Southern Bell Telephone & Telegraph Company ("Southern Bell") to dismiss, or, in the alternative, for summary judgment. Defendant moves for dismissal of the antitrust claims brought by Plaintiffs, customers of Southern Bell, on the grounds that the Plaintiffs lack antitrust standing. In the alternative, Defendant seeks summary judgment on the antitrust claims on the grounds that its conduct is immune from antitrust liability under the state action doctrine. For the reasons stated below, the Court denies the motion to dismiss for lack of antitrust standing and grants the Defendant partial summary judgment with respect to the antitrust claims based on the state action doctrine. The Court defers ruling on Defendant's motion with respect to the state law claims until the federal antitrust issues have been resolved.

## I. STATEMENT OF THE CASE

Plaintiffs, customers of Southern Bell, initiated this class action[1] seeking monetary damages for violations of the antitrust laws, Florida Civil Remedies for Criminal Practice Act ("Florida RICO"), restitution, breach of duty of good faith and fair dealing, and other statutory violations under Florida law.[2] The only federal claims stated are for monopolization and attempted monopolization in violation of § 2 of the Sherman Act, 15 U.S.C. § 2. The Court has pendent jurisdiction over the remaining claims.

This suit arises out of the terms upon which Southern Bell furnished inside wire maintenance service ("IWMS") to its customers in the State of Florida since 1983. Inside wire is the telephone wire within the customer's home or office which connects the telephone jack to the telephone company's outside plant. It includes the telephone jacks, but not the customer's telephone equipment. The class of Plaintiffs allegedly consists of all residential and business customers of Southern Bell in the State of Florida who have paid for Southern Bell's optional IWMS between the time the service became optional through the date of class certification.

The complaint alleges the following facts. Prior to 1983, Southern Bell maintained all the inside wiring for residential and business customers. IWMS was part of, or was "bundled with," basic telephone service provided by Southern Bell pursuant to a monopoly franchise from the State of Florida and regulated by the Florida Public Service Commission ("PSC").[3] In 1982, the PSC ordered that IWMS be separated, or "unbundled," from basic telephone service. The PSC intended to promote competition in the IWMS market.

In June of 1983, Southern Bell for the first time offered its customers IWMS as a separate service, through a "negative option" contract announced in a billing insert. Plaintiffs allege that the insert contained untrue, deceptive, or misleading statements and omissions; specifically, it failed to inform customers that it was a contract offer and implied that repairing inside wire was a difficult task that could not be undertaken by the customer. Pursuant to the terms of the negative option contract, customers were to continue to receive IWMS from Southern Bell unless they affirmatively requested otherwise, and were charged $.55 per month for the service. The new $.55 charge for IWMS was included in the charge for local telephone service.

From February to June of 1987, Southern Bell sent out two or more billing in-

---

**1.** The Court has not yet certified the class.

**2.** Plaintiffs seek treble damages for violations of § 2 of the Sherman Act and Florida Antitrust Act of 1980, Fla.Stat. § 542.19 (1987), treble damages for violations of the Florida RICO laws, and treble damages for violations of Fla. Stat. § 817.061.

**3.** Inside wire is used in both interstate and intrastate communication and is regulated concurrently by both the State and the federal government.

serts to its customers, including a ballot check-off which provided that Southern Bell would *continue* to provide IWMS if the customer so requested. These inserts allegedly contained the same types of misrepresentations and omissions as the 1983 insert.

In March 1988, Southern Bell sent its customers another billing insert containing a second negative option contract for IWMS which increased the cost of service from $.55 per month to $1.00 per month. Customers would accept the new "offer" if they did not act. The billing insert contained defects similar to those contained in prior inserts. Another negative option contract mailed to customers in the late Spring of 1989 raised the charge for IWMS to $1.50 per month.

Plaintiffs allege that by this conduct, Southern Bell willfully either acquired or maintained, or attempted to acquire or maintain, monopoly power in the IWMS markets, which resulted in unlawful monopoly profits for Southern Bell.

The facts presented in connection with the motion to dismiss, or, in the alternative, for summary judgment provide additional information about the events Plaintiffs describe in the complaint. The parties agree that the PSC considered the unbundling of IWMS and new charges for the service at great length during the first half of 1983. Moreover, Jack Shreve, Esq., Public Counsel appointed by the State legislature to provide representation for the people of the State of Florida in proceedings before the PSC, participated fully in the decision-making process. It is uncontroverted that Southern Bell had to obtain the approval of the staff of the PSC to use the billing insert containing the 1983 negative option contract prior to mailing the insert to customers. The staff did in fact approve the billing insert prior to mailing. Plaintiffs, however, have raised a genuine issue as to whether the Commissioners themselves ever considered the manner in which Southern Bell would offer IWMS to customers.

Finally, it is clear that by Order dated December 31, 1986, Order No. 17040, the PSC deregulated the IWMS market, effective January 1, 1987. By that Order (in conjunction with an Amendatory Order, dated January 28, 1987, Order No. 17040A) the PSC directed Southern Bell to give each customer receiving IWMS from Southern Bell since July 3, 1983 a chance to affirmatively "opt in" to Southern Bell's IWMS program.[4]

## II. DISCUSSION

### A. Antitrust Standing

Defendant first contends that the federal and state antitrust claims should be dismissed because Plaintiffs lack antitrust standing. Specifically, Defendant argues that Plaintiffs lack standing because they have not alleged an antitrust injury, that is, an injury "attributable to an anti-competitive aspect of the practice under scrutiny...." *Atlantic Richfield Co. v. USA Petroleum Co.*, — U.S. ——, 110 S.Ct. 1884, 1889, 109 L.Ed.2d 333 (1990). Plaintiffs contend that as consumers paying excessive monopoly prices, they clearly have standing under *Reiter v. Sonotone Corp.*, 442 U.S. 330, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979), to raise violations of § 2 of the Sherman Act.

In determining whether Plaintiffs have standing to bring this antitrust action, the Court is bound by the four corners of the complaint. *Mr. Furniture v. Barclays American/Commercial, Inc.*, 919 F.2d 1517, 1520 (11th Cir.1990); *Austin v. Blue Cross and Blue Shield*, 903 F.2d 1385, 1387 (11th Cir.1990).[5] Viewed in the light most favorable to the Plaintiffs, the salient portions of the complaint allege that subsequent to the decision of the PSC to introduce competition in the IWMS market,

---

4. For information regarding federal preemption and detariffing of IWMS, see *National Ass'n of Regulatory Utility Com'rs v. F.C.C.*, 880 F.2d 422 (D.C.Cir.1989); *In the Matter of Detariffing the Installation of Maintenance of Inside Wiring*, 5 F.C.C. Rec. 3407 (May 31, 1990) (second further notice of proposed rulemaking).

5. The Court recognizes that standing is jurisdictional and that a defendant may bring a factual attack on plaintiff's standing. In this case, however, Defendant clearly brings only a facial challenge to Plaintiffs' antitrust standing. *See* Defendant's "Statement of Material Facts Pursuant to Local Rule 10.J.2," at p. 1.

Southern Bell willfully acquired and maintained a monopoly in the IWMS market through anticompetitive acts. The anticompetitive behavior includes offering IWMS to Southern Bell's customers through negative option contracts and making untrue, deceptive, and misleading representations of the service offered by Southern Bell. The complaint further alleges that Plaintiffs were injured by paying monopoly overcharges for IWMS from Southern Bell.

Section 4 of the Clayton Act, 15 U.S.C. § 15, which creates a private right of action for antitrust violations, provides that "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue. ..." As noted by the United States Court of Appeals for the Eleventh Circuit, the concept of antitrust standing "has proved to be somewhat elusive." *Mr. Furniture*, 919 F.2d at 1520 (citing *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 102 S.Ct. 2540, 2547, 73 L.Ed.2d 149 (1982). The Court must assess a series of interrelated factors to determine whether Plaintiffs have been injured "by reason of" an antitrust violation under the Clayton Act: "1) the existence of a causal connection between the antitrust violation and the alleged injury; 2) the nature of the plaintiff's alleged injury; 3) the directness or indirectness of the asserted injury and the related inquiry of whether the damages are speculative; 4) the potential for duplicative recovery or complex apportionment of damages; and finally, 5) the existence of a more direct victim of the alleged anticompetitive conduct." *Austin*, 903 F.2d at 1388 (citing *Associated General Contractors v. California State Council*, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983)); *see also Mr. Furniture*, 919 F.2d at 1520 (listing four similar factors).[6]

Defendant focuses primarily on the first of the five factors listed above. And in-

deed, a review of the case law reveals that the application of the remaining four factors favors a finding of antitrust standing in this case: the Supreme Court has held that direct consumers have standing to sue for injury resulting from prices "artificially inflated by reason of. ... anticompetitive conduct. ..." *Reiter*, 99 S.Ct. at 2332. As in *Reiter*, Plaintiffs in this case are direct consumers of the allegedly overpriced product.

The only substantial distinction in terms of antitrust standing between the instant case and *Reiter* is the nature of the alleged anticompetitive conduct and its nexus with the alleged injury. In *Reiter*, the nexus between the anticompetitive conduct and the injury is obvious because plaintiffs alleged that they paid higher prices due to price fixing, a *per se* violation of § 1 of the Sherman Act. In this case, the connection between the allegedly anticompetitive conduct and the injury is less certain. Thus, Defendant has identified correctly the most vulnerable aspect of Plaintiffs' case—antitrust injury or injury "attributable to an anti-competitive aspect of the practice under scrutiny. ..." *Atlantic Richfield Co. v. USA Petroleum Co.*, —— U.S. ——, 110 S.Ct. 1884, 1889, 109 L.Ed.2d 333 (1990).[7] As an analysis of *Reiter* indicates that all the factors, except the first factor, support a finding that Plaintiffs have standing to bring these antitrust claims, the Court addresses below the only remaining issue, the nexus between the alleged injury and the anti-competitive conduct.

 Defendant disputes the existence of the requisite nexus between Plaintiffs' injury and Defendant's conduct primarily on the grounds that Plaintiffs do not allege sufficient facts showing Defendant's acts to be anticompetitive. Defendant contends that the improper acts alleged in the complaint, the negative option contracts and the misleading and deceptive representations, were acts which would give rise to

6. The so-called "target zone test" used by the Eleventh Circuit to determine antitrust standing comprises the five factors enunciated by the Supreme Court in *Associated General Contractors. Austin*, 903 F.2d at 1389.

7. Stated another way, this aspect of antitrust standing requires that the injury alleged not only be "of the type the antitrust laws were intended to prevent [but also] flow from that which makes defendants' act unlawful." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977).

state law claims, not federal antitrust claims. Clearly, the allegedly anticompetitive conduct that forms the basis for the antitrust claims also forms the basis for Plaintiffs' Florida RICO and other statutory claims, as well as for Plaintiffs' contract claims. Nevertheless, the mere existence of a tort or state law remedy for the improper conduct fails to preclude appropriate antitrust remedies. *See International Travel Arrangers, Inc. v. Western Airlines, Inc.*, 623 F.2d 1255 (8th Cir.1980) (use of misleading advertising by airline to gain monopoly and keep charter airline out of the market constitutes a violation of § 2 of the Sherman Act), *cert. denied*, 449 U.S. 1063, 101 S.Ct. 787, 66 L.Ed.2d 605 (1980); *see also* Areeda & Turner, *Antitrust Law*, Vol. III § 737b (1978) ("The existence of a tort remedy does not necessarily obviate antitrust concern. The public interest in competition is not necessarily vindicated by private tort remedies.").

Moreover, contrary to Defendant's assertions, the Court cannot find that the use of negative option contracts and misleading representations to customers is *not* anticompetitive as a matter of law. The Federal Communications Commission has stated that default procedures, or negative options, such as the ones used by Southern Bell, are anticompetitive. Memorandum Opinion and Order re: Investigation of Access and Divestiture Related Tariffs, 50 F.R. 25982 (June 24, 1985) (default options are against the public interest because they confer advantage on company due to historical monopoly position and deny benefits of competition). Furthermore, at oral argument, Plaintiffs alleged that where a negative option was used, a telephone company would capture more than 85% of the market, but where a positive option was used, the phone company would capture only 30% to 50% of the market.[8] Plaintiffs have alleged that Southern Bell willfully captured a monopoly in the IWMS market through negative options and misleading representations, and the Court cannot at this stage of the proceeding find that these acts were not anticompetitive as a matter of law.

The district court's decision in *Sollenbarger v. Mountain States Tel. & Tel. Co.*, 121 F.R.D. 417 (D.N.M.1988) further bolsters Plaintiffs' position. *Sollenbarger* is virtually indistinguishable from the instant case on the facts,[9] although the question of antitrust injury arose in the context of plaintiffs' motion for class certification, rather than in a motion to dismiss for lack of standing. The court considered the defendant's argument that plaintiffs had not suffered an antitrust injury, and relying on *Reiter v. Sonotone, supra*, rejected it: "if [the defendant] is implicitly arguing that plaintiffs have not suffered an injury covered by § 4 of the Clayton Act, 15 U.S.C. § 15, [the defendant] is incorrect." 121 F.R.D. at 426.

The Court believes that the antitrust standing requirements of § 4 of the Clayton Act do not require Plaintiffs to plead every fact necessary to tie the allegedly anticompetitive conduct to the injury. The facts necessary to show "antitrust injury" are often very complex, as in this case.[10] So long as the facts alleged, viewed in the

---

**8.** Exhibit 9 to the Cresse deposition, filed in opposition to Defendant's motion, is entitled "Inside Wire Survey." This survey certainly would create an issue as to whether telephone companies using a negative option generally gained a substantially greater share of the telephone users market than did the telephone companies that used positive options. (It should be noted, however, that the relevant market for measuring whether a particular company has a monopoly has not yet been defined.) Although Defendant brings only a facial attack on Plaintiffs' standing to bring the antitrust claims, the additional facts alleged by Plaintiffs highlight that the allegations of the complaint, viewed in the light most favorable to the plaintiff, support an inference of antitrust injury.

**9.** Plaintiffs alleged that Mountain States Telephone and Telegraph Co. monopolized the market for IWMS in violation of § 2 of the Sherman Act through negative option contracts for IWMS. 121 F.R.D. at 420–21.

**10.** In footnote 10 to the supplemental brief, Plaintiffs offer to provide an affidavit from an expert witness setting forth the economic theory and evidentiary facts supporting Plaintiffs' assertion that competition would have limited the price of IWMS absent Southern Bell's practices. Moreover, at oral argument, Plaintiffs stated that Southern Bell intended to exclude Sears, Roebuck from the IWMS market. The Court need not consider these facts, as Defendant's challenge to Plaintiffs' standing is on the face of

light most favorable to Plaintiffs, indicate that Plaintiffs have suffered an antitrust injury, then Plaintiffs have met their threshold burden. Viewed in their best light, the facts alleged in the complaint support an inference of a "nexus between the assumed § [2] violation and [Plaintiffs'] injury...." *Mr. Furniture,* 919 F.2d at 1521. Thus, Plaintiffs have carried their burden through this stage of the proceedings.

Resolution of the standing issue nevertheless does not assure recovery under the Sherman Act. Antitrust injury "is indeed a threshold requirement, but it is not only that." Areeda & Hovenkamp, *Antitrust Law,* 1989 Supp. § 334.3b (1989). Questions of standing, injury in fact, antitrust injury and damages are closely related concepts, and regardless of what it is called, there must be some loss "attributable to an anti-competitive aspect of the practice under scrutiny" proven before Plaintiffs can recover. *Id.* at § 334.3.[11] Defendant therefore is not precluded from renewing its motion for summary judgment at any such time it appears that Plaintiff cannot satisfy all the elements necessary for recovery on the antitrust claim. *Id.; see also Atlantic Richfield,* 110 S.Ct. at 1888–89 (lack of antitrust injury before the court on motion for summary judgment); *Brunswick Corp.,* 97 S.Ct. at 694–95 (lack of antitrust injury before the court on damage issue).

### B. State Action

Defendant also argues that it is entitled to summary judgment on the grounds that its actions were "state action" exempt from antitrust law.[12] The Court agrees that Southern Bell's actions were immunized from prosecution under the antitrust laws throughout the period when the PSC regulated inside wire maintenance service.

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if "there is no genuine issue as to any material fact and [if] the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Rule 56(c) mandates summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to the case, on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Further, the non-moving party must raise an issue for trial by showing that there is sufficient evidence for a jury to return a verdict for the non-moving party. If the evidence is merely colorable or not significantly probative, summary judgment will be granted. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986).

Private conduct becomes state action immune from antitrust liability when the challenged restraint meets a two-pronged test: 1) it must be "clearly articulated" as State policy, and 2) the policy must be "actively supervised" by the State. *Consolidated Gas Co. v. City Gas Co.,* 880 F.2d 297, 301 (11th Cir.1989), *reinstated, en banc,* 912 F.2d 1262 (11th Cir.1990) (citing *California Retail Liquor Dealers*

---

the complaint. These are the types of facts that Plaintiffs will ultimately need to prove, but clearly not all of them must be included in the complaint.

**11.** It would not be enough, for example, to show that Southern Bell abused its monopoly power by overcharging customers for IWMS: the courts have held that exploitative monopoly pricing is not unlawful in and of itself. *See Continental Cablevision of Ohio v. American Elec. Power Co.,* 715 F.2d 1115 (6th Cir.1983); *Berkey Photo Inc. v. Eastman Kodak Co.,* 603 F.2d 263 (2d Cir.1979), *cert. denied,* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980). Rather, to entitle them to judgment Plaintiffs must prove that absent Southern Bell's anticompetitive practices, Southern Bell would not have enjoyed a monopoly in the IWMS market and competition would have resulted in lower prices for consumers. The Court need not decide at this juncture whether consumers of the IWMS should also be deemed competitors in the IWMS market. *See Homeco Dev. v. Markborough Properties Ltd.,* 709 F.Supp. 1137 (S.D.Fla.1989) (consumers also competitors).

**12.** Plaintiffs initially requested more time for discovery if the Court were inclined to grant Defendant's motion for summary judgment. By affidavit filed June 21, 1990, Plaintiffs' counsel withdrew the request for any additional discovery, and subsequently have failed to reinstate the request for additional discovery.

*Assn. v. Midcal Aluminum, Inc.*, 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980)). Each prong of the test is discussed below.

### 1. Clearly Articulated State Policy

As to the first prong of the test, State policy need not compel the challenged conduct of the private party. *Southern Motor Carriers Rate Conference Inc. v. U.S.*, 471 U.S. 48, 105 S.Ct. 1721, 1729, 85 L.Ed.2d 36 (1985).[13] Rather, the State need only permit the alleged restraint:

> [a] private party acting pursuant to an anticompetitive regulatory program need not "point to a specific, detailed legislative authorization" for its challenged conduct. As long as the State as sovereign clearly intends to displace competition in a particular field with a regulatory structure, the first prong of the *Midcal* test is satisfied.

*Id.* 105 S.Ct. at 1730 (citations omitted).

It is undisputed that the Florida legislature has given the PSC broad authority to regulate telephone common carriers. *See* Fla.Stat. §§ 364.01, 364.02(3), 364.03(1), 364.035, 364.04(1), 364.05(1), and 364.19; *see also* § 350.001 ("The Florida Public Service Commission has been and shall continue to be an arm of the legislative branch of government."). Under § 364.19, the PSC "may regulate, by reasonable rules, the terms of telephone service contracts between telephone companies and their patrons." The term service "is used in this chapter in its broadest and most inclusive sense." Fla.Stat. § 364.02(3). Section 364.03(1) provides that "the facilities, instrumentalities, and equipment furnished by [Southern Bell] shall be safe and kept in good condition and repair and its appliances, instrumentalities, and service shall be modern, adequate, sufficient, and efficient." The authorizing legislation gives the PSC substantial latitude to determine how to set rates for service:

> In fixing the just, reasonable, and compensatory rates, charges, fares, tolls, or

rentals to be observed and charged for service within the state by any and all telephone companies under its jurisdiction, the commission is authorized to give consideration, among other things, to the efficiency, sufficiency, and adequacy of the facilities provided and the services rendered, including energy conservation and the efficient use of alternative energy resources; the value of the service to the public; and the ability of the telephone company to improve such service and facilities....

Fla.Stat. § 364.035(1).

Moreover, the "clearly articulated" prong of the state action test is satisfied if the action is of a kind contemplated by the legislature. *Hallie v. Eau Claire*, 471 U.S. 34, 105 S.Ct. 1713, 1719, 85 L.Ed.2d 24 (1985). The legislature need not contemplate the precise action complained of as long as the anticompetitive effects are a foreseeable result of regulation. *Metro Mobile CTS, Inc. v. Newvector Communications, Inc.*, 661 F.Supp. 1504, 1510 & n. 4 (D.Ariz.1987), *aff'd on other grounds*, 892 F.2d 62 (9th Cir.1989). Plaintiffs acknowledge that prior to the effective date of Order No. 11345, dated November 22, 1982, IWMS had always been "bundled with," or automatically included in, basic telephone service. Given this fact and the broad authority granted to the PSC, the legislature must have contemplated that the PSC would regulate the terms upon which Southern Bell offered customers IWMS. That the PSC's decision involved a minor detail of the regulatory scheme—the manner in which IWMS was offered to the public—does not alter the state action analysis. *Newvector*, 661 F.Supp. at 1512 (citing *Southern Motor Carriers*, 105 S.Ct. at 1730.).

Plaintiffs emphasize, however, that the PSC's primary reason for unbundling IWMS from Southern Bell's basic service in 1983 appears to have been to foster "the development of a competitive environment

---

**13.** Plaintiffs rely heavily on *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976), to support their position that a "clearly articulated" State policy is not present in this case. The Court finds that the Plaintiffs' reliance on *Cantor* is misplaced in

light of the more recent *Southern Motor Carriers* opinion. *See Metro Mobile CTS, Inc. v. Newvector Communications, Inc.*, 661 F.Supp. 1504, 1513 (D.Ariz.1987) (reliance on *Cantor* misplaced), *aff'd on other grounds*, 892 F.2d 62 (9th Cir.1989).

for the provision and maintenance of inside wire." Order of the Public Service Commission, No. 11711, dated March 11, 1983, at 3. They contend that in light of the PSC's decision to promote competition in the IWMS market, Defendant's state action argument fails because Florida has no clearly articulated policy to displace competition in the IWMS market. Plaintiffs further argue that the policy to displace competition applies only to basic telephone service and the PSC's decision indicates that the legislature has chosen competition over regulation in the IWMS market. Although superficially appealing, the Court finds that upon closer inspection, Plaintiffs' argument lacks merit.

In *Metro Mobile CTS, Inc. v. Newvector Communications, Inc., supra,* the court rejected a similar argument. Plaintiff argued that "the regulatory policy of the State of Arizona as it is defined by the [Commission] is intended to foster competition rather than to replace competition with regulation." 661 F.Supp. at 1514. In response to this argument, the court carefully reviewed *Southern Motor,* and concluded that "[s]o long as the state as sovereign has exercised the power to regulate, has established the method by which it will execute its policy to regulate, and retains the power to alter that method, it does not forfeit that power by introducing competition into the regulation." *Id.* at 1516. The court reasoned that "if inclusion of antitrust principles of competition as a part of a state's public policy prevents the state from enforcing its policy outside the con-

straints of the antitrust laws, states will be inclined to eliminate antitrust goals in favor of other state economic goals." *Id.* at 1515.

This Court adopts the reasoning of the court in *Newvector,* and finds that the first prong of the state action test is met in this case. *See also* Areeda & Hovenkamp, *Antitrust Law,* 1989 Supp. § 212.3 (1989) (conclusion in *Newvector* "seems inescapable."). The State of Florida clearly established a policy of regulating contracts for phone service between Southern Bell and customers. At the time Florida established this policy, IWMS was included in basic telephone service. The PSC, pursuant to its authority to regulate service contracts, decided that the best means of fulfilling its legislative mandate was to introduce competition into the IWMS market. Plaintiffs have not argued that the PSC acted outside the scope of its authority in making this decision. Moreover, although the PSC now has deregulated the market for IWMS, there is no apparent reason that the PSC could not resume regulating IWMS with respect to price regulation, terms and conditions of service regulation, and providers of last resort regulation.[14]

To hold that antitrust immunity is destroyed because the PSC introduced competition into the State regulatory scheme would be incongruous. That the PSC ultimately chose to deregulate the IWMS market entirely does not affect the Court's analysis with respect to whether the State had a clearly articulated policy of regulation.[15] As noted by the Court in *Newvec-*

---

**14.** The F.C.C. currently intends to preempt the regulation of IWMS to the extent of requiring that such service be unbundled from other services. The F.C.C., however, has stated that in light of the Court of Appeals decision in *National Ass'n of Regulatory Utility Com'rs v. F.C.C.,* 880 F.2d 422 (D.C.Cir.1989), it does not intend to preempt price regulation, regulation of terms and conditions of service, or provider's last resort regulation. *See In the Matter of Detariffing the Installation of Maintenance of Inside Wiring,* 5 F.C.C. Rec. 3407 (May 31, 1990) (second further notice of proposed rulemaking).

**15.** In *Newvector,* the court noted that footnote 25 of the Supreme Court's opinion in *Southern Motor Carriers, supra,* could be read to preclude antitrust immunity where the PSC could choose competition as a method of fulfilling its legisla-

tive mandate. 661 F.Supp. at 1516. The example the Supreme Court refers to in footnote 25 of a case in which the State failed to clearly articulate a policy is *Community Communications Co. v. Boulder,* 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982). *Boulder,* however, is completely inapposite upon the facts of the instant case. *See Newvector,* 661 F.Supp. at 1516 n. 8. In *Boulder,* the State constitution gave municipalities "home rule" powers. 102 S.Ct. at 837. Pursuant to the "home rule" law, the City of Boulder enacted an ordinance prohibiting a local cable company from expanding its business. 102 S.Ct. at 837–38. The cable company sued the City of Boulder.

The Supreme Court held that the home rule law did not amount to a clearly articulated policy permitting the City of Boulder's anticompetitive conduct, stating that "[a] State that al-

*tor*, the impact of the PSC's decision to deregulate is better understood in terms of the second prong of the state action test: "[t]he question of whether a particular product, market or services, 'deregulated' at the time of the alleged anticompetitive conduct, is subject to antitrust scrutiny is better considered under the active supervision prong of the *Midcal* test." 661 F.Supp. at 1518 n. 11. In sum, the Court finds that the legislature's policy of regulation with respect to telephone service satisfies the first prong of the state action test.

### 2. Active Supervision

The second prong of the state action test, the "active supervision" prong,

> 'requires that state officials have and exercise power to review particular anticompetitive acts of private parties and disapprove those that fail to accord with state policy. Absent such a program of supervision, there is no realistic assurance that a private party's anticompetitive conduct promotes state policy, rather than merely the party's individual interests.'

*Consolidated Gas Co.*, 880 F.2d at 303 (quoting *Patrick v. Burget*, 486 U.S. 94, 108 S.Ct. 1658, 1663, 100 L.Ed.2d 83 (1988)). Thus, "some state involvement or monitoring" will not immunize otherwise private conduct from the federal antitrust laws, *id.*, and Southern Bell cannot rely on the " 'gauzy cloak of state involvement' "—the PSC's "mere acquiescence" or "passive acceptance"—to shield it from antitrust liability. *Consolidated Gas Co.*, 880 F.2d at 303 (quoting *Midcal* at 100 S.Ct. at 942–43.). Rather, the Defendant must show that the PSC "exercise[d] ultimate control over the challenged anticompetitive conduct." *Patrick v. Burget*, 486 U.S. 94, 108 S.Ct. 1658, 1663, 100 L.Ed.2d 83 (1988).

The PSC has extensive procedures in place for supervising telephone companies, including the presence of Public Counsel

appointed by the State legislature "to provide legal representation for the people of the state in proceedings before the commission." *See* Fla.Stat. § 350.0611; *see generally* Fla.Stat. §§ 350.001, *et seq.* Moreover, the Supreme Court of Florida and the District Court of Appeal, First District, review challenges to the PSC's decisions pursuant to Fla.Stat. § 350.128. In this case, it is undisputed that on January 27, 1983, the PSC issued an Order which suspended, pending hearing, the implementation of the new charges, including the unbundled IWMS charges, proposed by Southern Bell to the PSC on November 23, 1982 ("1982 Rate Case"). On March 3, 1983, the PSC issued a Notice of Hearing on the issue of Southern Bell's rates, including the rates for IWMS. The Notice set a prehearing conference on April 1, 1983, and scheduled the final hearing for April 25–May 6, 1983.

After suspending Southern Bell's proposed tariff, the PSC conducted a comprehensive analysis and hearing concerning the propriety of Southern Bell's proposed rates, which included the proposed schedule of rates and charges for IWMS. Public Counsel was present at these hearings. Indeed, in the Final Order on the 1982 Rate Case, the PSC found that "Public Counsel conducted discovery, presented evidence at the hearing, and otherwise fully participated as a party in this case." Order No. 12221, dated July 13, 1983. By this same Order, the PSC directed Southern Bell to prepare a billing insert announcing the options for IWMS, *inter alia*, and stated that "[t]he bill stuffer shall be submitted to the Commission staff for review and approval prior to its use." Order No. 12221 at 52. Southern Bell submitted the 1983 billing insert containing the negative option plan and the alleged misrepresentations and omissions to the PSC staff for approval, as directed by the Commissioners. It is uncontroverted that the staff reviewed the

---

lows its municipalities to do as they please can hardly be said to have 'contemplated' the specific anticompetitive actions for which municipal liability is sought." 102 S.Ct. at 843. In contrast, in this case, the legislature of the State of Florida gave the PSC broad authority to regulate the entire field of basic telephone service, which at the time included IWMS. Thus, unlike

*Boulder*, in which there was absolutely no relation between the "home rule" law and the City's restriction of cable service, in the instant case the State authorized regulation of a specific field and thus the anticompetitive conduct was clearly within the legislature's contemplation. *See also Auton v. Dade City*, 783 F.2d 1009 (11th Cir.1986) (distinguishing *Boulder*).

relevant insert, revised it twice, and approved it.

Thus, it appears that the PSC exercised "ultimate control over the challenged anticompetitive conduct," in this case, the decision to offer IWMS to Southern Bell's current customers through a negative option plan. The PSC's conduct was clearly more than "mere acquiescence" to Southern Bell's plan. The PSC had to act affirmatively and approve the billing insert if Southern Bell customers were to be offered IWMS through a negative option contact. The PSC's action appears on its face to satisfy the second prong of the state action test.

Plaintiffs, however, argue that Defendant fails to show that its conduct was actively supervised because the individual members of the PSC never specifically addressed the method by which Southern Bell would offer the options regarding IWMS to its customers.[16] As support for this proposition, Plaintiffs introduce substantial evidence to suggest that Southern Bell never presented the Commissioners of the PSC, as opposed to the staff, with the negative option issue.[17] Moreover, Plaintiffs contend that the staff's approval of the negative option is inadequate to confer antitrust immunity because 1) the Commissioners did not intend to delegate this decision to the staff, and 2) under Fla.Stat. § 120.57, any delegation would have been invalid.

The Court declines to review the propriety of the Commissioners' failure to decide the negative option issue, or their decision to delegate the issue to their staff, or the staff's misunderstanding of the boundaries of their authority, or any related issue. Although Plaintiffs contend that the Commissioners failed to consider the negative option issue because Southern Bell did not raise the issue at any time before submitting the billing insert to the staff, there is also uncontroverted evidence in the record that the Commissioners generally were aware of the negative option issue. At the Special Agenda Conference, held June 22, 1983, Commissioner Gunter stated,

> Well, you know, the problem with a majority of people, and I think we need to address this one carefully. The problem with a majority of people in the Centel [another local telephone, serving northern Florida] service area did not have the wildest idea that they could elect to avoid a cost, because they didn't read all of that bill stuffer and they didn't call. But they put the burden on the customer to call and not get that maintenance option. Or he automatically got it.

Transcript (Volume VI), FPSC Docket No. 820294–TP, at 763. The record does not reflect that the Commissioners specifically addressed the issue of a negative option offering of IWMS, despite Commissioner Gunter's concern.

Regardless of what the evidence indicates or what the Commissioners knew or should have known, or decided or should have decided, this Court clearly may not delve into the internal workings of the PSC. As a general rule, the federal courts do not probe for defects in the State's decision to authorize the anticompetitive conduct. As stated by the Ninth Circuit, "actions otherwise immune [under the state action doctrine] should not forfeit that protection merely because the state's attempted exercise of its power is imperfect in execution under its own law." *Llewellyn v. Crothers*, 765 F.2d 769, 774 (9th Cir.1985). This applies to errors of law, fact, or judgment, errors of either substance or procedure. *Id.*

There are two reasons for the courts to shun such an inquiry. First, the State's immunity from the antitrust laws "springs from an essential principle of federalism." Thus, " '[o]rdinary' errors or abuses in the

---

**16.** Plaintiffs do not dispute that the PSC had the authority to decide the manner in which IWMS options would be offered to customers.

**17.** Plaintiff present substantial evidence to raise a genuine issue as to whether the Commissioners themselves considered the negative option issue. For example, former Commissioner Cresse testified as follows:

> Q. Did you authorize a negative option....?
> A. If, I guess you could answer that two ways, if by saying you submit this to the staff and have the staff review and approve it, then to that extent yes, we authorized it. But did we [the Commissioners] address specifically this language, the answer is no.
> Cresse deposition, April 12, 1990, at 25.

administration of powers conferred by the state should be left for state tribunals to control.'" *Id.* (quoting Areeda, *Antitrust Immunity for "State Action" After Lafayette*, 95 Harv.L.Rev. 435, 453 (1981)). If the federal antitrust court undertook an inquiry into the appropriateness of the decision to authorize the anticompetitive conduct, it would

> inevitably become the standard reviewer of governmental agencies whenever it is alleged that the agency, though possessing the power to engage in the challenged conduct, has exercised its power erroneously.

*Id.*

Second, "there should be a defense [to antitrust liability] for those reasonably relying on the appearance of legality when a state agency's exercise of power is unauthorized." *Lease Lights Inc. v. Public Service Co.*, 849 F.2d 1330, 1334 (10th Cir. 1988), *cert. denied*, 488 U.S. 1019, 109 S.Ct. 817, 102 L.Ed.2d 807 (1989). The absence of such a defense "would require regulated industries to seek judicial review of every order of a regulatory agency to ensure that compliance does not later subject them to antitrust liability." *Id.*

Plaintiffs' contention that the PSC did not actively supervise Southern Bell's conduct must fail because it is little more than an allegation that the State exercised its power erroneously. Moreover, Southern Bell had the right to rely on the PSC's approval of the twice-revised insert regarding IWMS. Nothing in the record indicates that Southern Bell should have been aware that using a negative option was improper; indeed, Centel's use of a negative option clearly established precedent for Southern Bell's decision to offer IWMS through a negative option contract. Whether the staff incorrectly approved the insert or the Commissioners improperly or negligently delegated the decision to its staff is a matter of internal agency procedure and the laws of the State of Florida, which should be left for State tribunals, not this Court, to decide.[18]

Thus, the Court finds that Southern Bell is immune from antitrust liability under the state action doctrine for any antitrust liability resulting from the 1983 negative option contracts. Defendant, however, has failed to show that its activities subsequent to 1986 were supervised by the PSC. Therefore, the Court finds that Southern Bell's conduct after December 31, 1986 is not immunized from antitrust liability.

## III. CONCLUSION

Accordingly, it is ORDERED and ADJUDGED that the motion to dismiss, or, in the alternative, motion for summary judgment, is GRANTED IN PART and DENIED IN PART for the reasons stated above. The motion to dismiss Counts I–IV for lack of antitrust standing is DENIED.[19] The motion for summary judgment on the antitrust claims is GRANTED IN PART. Southern Bell is immunized from antitrust liability through December 31, 1986, when the PSC deregulated IWMS.[20]

In addition, the Court DEFERS ruling on the Plaintiffs' motion for class certification until such time as discovery has been developed fully as to the alleged antitrust claims. The Court also DEFERS ruling on the viability of the pendant claims until discovery has fleshed out the relevant facts as to those claims. It is further

ORDERED that discovery is reopened for a period of six months or until such time as discovery has advanced to a stage that further consideration by the Court of

---

**18.** The Court notes that this case differs significantly from the case in which the regulated utility misrepresents facts to the relevant agency. Southern Bell completely disclosed its intended use of a negative option to the PSC when it submitted the bill stuffer to the staff of the PSC for approval.

**19.** The Court also denies Defendant's motion to dismiss Plaintiffs' leveraging allegations for failure to state a cause of action under § 2 of the Sherman Act because Plaintiffs may be able to prove facts which would entitle them to judgment on the federal antitrust claims.

**20.** In light of this Court's ruling on the state action doctrine, the Court finds Defendant's argument regarding the *Keogh* doctrine moot.

the antitrust claims and pendent claims is appropriate.

DONE AND ORDERED.