CONSOLIDATED GAS COMPANY OF FLORIDA, INC., Plaintiff–Appellee,

v.

CITY GAS COMPANY OF FLORIDA, a Florida corporation, Defendant–Appellant.

No. 87–6108.

United States Court of Appeals, Eleventh Circuit.

Aug. 10, 1989.

James J. Kenny, Scott E. Perwin, Michael Nachwalter, Miami, Fla., for defendant-appellant.

Sylvia H. Walbolt, Tampa, Fla., for Florida Power amicus.

William H. Harrold, Tallahassee, Fla., for Florida Pub. Ser. Comm'n amicus.

James R. Atwood, Washington, D.C., for Florida Power & Light amicus.

Philip A. Allen III, Edward T. O'Donnell, William J. Dunaj, Teresa Ragatz, Miami, Fla., for plaintiff-appellee.

Before RONEY, Chief Judge, COX, Circuit Judge, and MORGAN, Senior Circuit Judge.

RONEY, Chief Judge:

City Gas Company of Florida appeals from a $4.76 million dollar judgment entered against it after the district court found City Gas violated federal antitrust laws by agreeing with another Dade County natural gas supplier not to compete in each other's territory, and by refusing to deal with appellee Consolidated Gas Company in its effort to convert from retail sales of liquid petroleum gas to natural gas. We affirm, essentially for the reasons stated in the district court's extremely thorough opinion. *Consolidated Gas Co. of Fla. v. City Gas Co. of Fla.*, 665 F.Supp. 1493 (S.D.Fla.1987).

The district court's opinion contains a complete recitation of the facts and procedural history of this case. Only a brief recount is necessary here.

Consolidated Gas began business in 1957 as a retail supplier of liquid petroleum (LP) gas to the home and businesses of the Bel Aire/Point Royale subdivision in southern Dade County. Appellant City Gas is essentially the only retail supplier of natural gas in its service area, which includes this subdivision. By March 1982, Consolidated determined it needed to convert to natural gas to survive in the marketplace, because rising oil costs had caused the retail cost of LP gas, which is derived from oil, to nearly double the retail cost of natural gas.

Consolidated applied for an allocation from the Federal Energy Regulatory Commission (FERC) and asked that it order the Florida Gas Transmission Company (FGT), the State's only wholesale pipeline supplier of natural gas, to provide and construct a new delivery point to connect FGT's facilities with those of Consolidated and to sell Consolidated all of its required natural gas.

FGT opposed the application contending that less costly alternatives were available, such as allowing City Gas to sell gas to the subdivision, and that its tariff required Consolidated to bear the cost of constructing a pipeline. Peoples Gas System intervened and objected to Consolidated's application, because it feared that if the application were granted it might diminish the supply of natural gas to FGT's existing customers which included Peoples. City Gas also intervened and objected on the same grounds.

Consolidated then explored the possibility of using City Gas' pipes to transport gas purchased from FGT or of buying gas directly from City Gas. During the FERC proceedings, City Gas indicated it would sell gas to Consolidated but the parties never came to an agreement on terms. Consolidated then sought an injunction to prevent City Gas from extending its pipelines any further into Consolidated's territory, recognizing that City Gas already had begun delivering gas to some customers within the subdivision. Although the state circuit court granted a preliminary injunction, it was later dissolved when the court ruled that Consolidated's so-called exclusive easements granting it the right to be the sole provider of gas to the subdivision could not be enforced as against public policy. This ruling was affirmed on appeal, although on slightly different grounds. *Consolidated Gas Co. of Fla. v. City Gas Co. of Fla.*, 447 So.2d 351 (Fla. 3d DCA), *rev. denied*, 456 So.2d 1181 (Fla. 1984).

During this time, Consolidated and City Gas also engaged in unsuccessful negotiations for the purchase of Consolidated's assets by City Gas. When this also failed, Consolidated sued in federal district court alleging that City Gas had engaged in exclusionary conduct in violation of federal antitrust laws on a variety of grounds.

After a bench trial, the district court found in favor of Consolidated on its monopolization claim, holding that section 2 of the Sherman Act was violated by Consolidated's territorial agreement with Peoples Gas, its only real competitor in South Florida, and that the City Gas offer to sell gas to Consolidated at an unreasonably high price amounted to a refusal to deal, also in

violation of the Act. Compensatory damages were determined to be $1,587,065, which when trebled pursuant to section 4 of the Clayton Act, 15 U.S.C.A. § 15(a), amounted to $4.76 million.

The district court ordered City Gas to sell or transport natural gas to Consolidated at a reasonable price. The court rejected City Gas' counterclaim in which it alleged antitrust violations by Consolidated in its development of a subdivision where the deeds covenanted that gas would be purchased only from it.

City Gas does not challenge the factual findings made by the district court, but rather appeals the legal principles applied to those facts. City Gas first contends that it does not have the monopoly power to "control prices or exclude competition," because it is a regulated industry, whose rates and competitors are governed by the Florida Public Service Commission. It argues that it cannot violate section 2 of the Sherman Act, because under the Florida statutes and case law, the power to control prices and determine the degree of competition in the natural gas industry in Florida is lodged exclusively in the Florida Public Service Commission. City Gas has no power to determine its own prices, much less the market price of natural gas. It likewise lacks the power to exclude competition. It follows, the argument goes, that City Gas is not a monopolist.

■ The district court properly dealt with this argument. The mere fact that City Gas is regulated does not automatically exempt it from compliance with federal antitrust provisions. "Activities which come under the jurisdiction of a regulatory agency nevertheless may be subject to scrutiny under the antitrust laws." *Otter Tail Power Co. v. United States*, 410 U.S. 366, 372, 93 S.Ct. 1022, 1027, 35 L.Ed.2d 359 (1973). The natural gas industry is subject to antitrust legislation. *See Southern Louisiana Area Rate Cases v. Federal Power Comm'n*, 428 F.2d 407, 442 n. 112 (5th Cir.), *cert. denied*, 400 U.S. 950, 91 S.Ct. 243, 27 L.Ed.2d 257 (1970).

■ As the district court stated, however, the presence of a system of regulation does diminish the effectiveness of one of the analytical tools frequently used by the courts in determining the existence of monopoly power, that is, a presumption that monopoly power exists if the market share enjoyed by the particular defendant exceeds 70 to 80 percent. In a regulated industry, "[a] predominate market share may merely be the result of regulation, and regulatory control may preclude the exercise of monopoly power." *Southern Pacific Communications Co. v. American Tel. & Tel. Co.*, 740 F.2d 980, 1000 (D.C.Cir. 1984), *cert. denied*, 470 U.S. 1005, 105 S.Ct. 1359, 84 L.Ed.2d 380 (1985). Thus, the entire regulatory scheme must be examined to determine whether a defendant, although regulated, still retained power to control prices or restrict entry into the market. *Id.* at 1001.

■ The district court first found that City Gas had monopoly power in the wholesale market for the resale of natural gas. It found that, like AT & T in *Southern Pacific*, the procedure was for City Gas to propose the rates at which it desires to sell gas, obtain an agreement with the buyer company, and then submit the agreement to the Commission for its approval. The court observed that because the Florida statute provides that natural gas utilities are not *required* to resell gas, it is "unclear" whether the Commission could compel City Gas to sell at any particular rate, although certainly it could withhold approval of a rate proposed by City Gas. The district court noted that FERC, which is the federal regulator of wholesale natural gas, does not control intrastate sales of natural gas and that City Gas therefore was "able to resell gas at will, essentially without regulatory intervention." 665 F.Supp. at 1520.

City Gas, although not disputing its authority to sell gas for resale, nevertheless argues that it has never done so and thus cannot be found to have monopoly power in the wholesale market. City Gas had, in fact, entered into a contract with a third party to sell its gas for resale, but no gas was ever actually sold under this agreement. The rather fortuitous circumstance,

however, that City Gas never actually sold any gas under this agreement does not obscure the fact that it had the *power* to do so. The district court was not clearly erroneous in finding that City Gas had monopoly power in the wholesale market.

Nor did the court err in its conclusion that City Gas also possessed monopoly power in the retail market. City Gas asserts that the fact that its rates are regulated by the Commission is dispositive of the monopoly issue. Yet, as the district court found, although the Commission must approve the rates at which natural gas is sold, it has allowed widely differing prices—proposed by the utility—with no apparent reason for the price difference. Thus, although the rates are subject to approval, there seems to be considerable authority vested in the utility to set the prices at which it will do business. The district court was not clearly erroneous in finding that this amounts to monopoly power.

Finally, there are high entry and exit barriers to this industry, which also lend support here to a finding of monopoly power. We reject City Gas' contention that because the barriers are not of its own making, but the result of the Commission regulation and the economic realities of a capital intensive industry, it does not have monopoly power. As the district court noted, the "defendant's innocence or blameworthiness, however, has absolutely nothing to do with whether a condition constitutes a barrier to entry." *Southern Pacific Communications Co.*, 740 F.2d at 1001. Because of the high entry barriers, City Gas' presence in the industry and its ownership of the massive system of pipes, an essential facility, it clearly has the power to exclude competition.

Of course, whether it exercises this power improperly is a distinct question. City Gas does not directly address this issue, arguing first a lack of monopoly power and then immunity under the state action doctrine. We nevertheless briefly discuss the district court's findings.

■ It is true that a regulated utility possesses a lawful, natural monopoly sim-

ply by virtue of the regulation. It remains accountable for abuse of that power, however, by engaging in anticompetitive conduct. *Otter Tail Power Co. v. United States*, 410 U.S. 366, 377, 93 S.Ct. 1022, 1029, 35 L.Ed.2d 359 (1973) (holding that regulated utility's use of monopoly power to "foreclose competition or gain a competitive advantage, or to destroy a competitor" violated antitrust laws); *see Continental Cablevision of Ohio, Inc. v. American Elec. Power Co.*, 715 F.2d 1115, 1120–21 (6th Cir.1983) (defendant electric utility with "lawful monopoly" not shown to have engaged in anticompetitive conduct in suit by cable television companies challenging very high rates for use of utility's poles). Pervasive regulation will not protect an industry from antitrust liability for "conduct that is voluntarily initiated." *MCI Communications Corp. v. American Tel. & Tel. Co.*, 708 F.2d 1081, 1103 (7th Cir.), *cert. denied*, 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983).

■ Conduct that would otherwise violate federal antitrust laws may nevertheless be permissible when done under the aegis of the State. *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). For private conduct to qualify for immunity under the state action doctrine, the challenged restraint must be (1) " 'one clearly articulated and affirmatively expressed as state policy,' " and (2) "the policy must be 'actively supervised' by the State itself." *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1980) (citation omitted.)

City Gas challenges only the district court's determination that it is not immune from antitrust liability for its territorial agreement with Peoples and its refusal to deal with Consolidated. This is the holding which amicus curiae briefs from electrical utilities have addressed. Indeed, the Florida Public Service Commission has filed a brief which asked that the holding in this case "be modified to clearly indicate that telephone, electric, and water and sewer utilities regulated by the Florida Public Service Commission are exempt from Sher-

man Antitrust provisions based on the explicit grant of legislative authority to designate exclusive service territories." Although we cannot hold that such utilities are exempt, because no case or controversy is before us, we do hold that this decision should not in any way be read to cast doubt on the proposition argued by the electric company and the Florida Public Service Commission briefs. Indeed, the analysis which leads to the conclusion that natural gas companies are not so protected is based on the statutes which do give such control to electric and other utility companies.

As the district court concluded, Chapter 366 of the Florida Statutes demonstrates that the Legislature "intended to substitute competition between public utilities for a regulatory program which would include foreseeable anticompetitive effects." The statute need not explicitly state what conduct is and is not permissible in order for that conduct to be undertaken pursuant to a clearly articulated state policy. *Southern Motor Carriers Rate Conference, Inc. v. United States*, 471 U.S. 48, 63–64, 105 S.Ct. 1721, 1730–31, 85 L.Ed.2d 36 (1985) (specific authority to allow collective ratemaking not necessary because legislature intended that rates would be set by regulatory agency and collective ratemaking just one aspect of ratesetting process).

Were the statutes silent with respect to exclusive territorial agreements, perhaps there would be some merit to City Gas' argument that the authority granted to the Commission in Fla.Stat. § 366.02 to "prescribe fair and reasonable rates and charges" includes the power to approve territorial agreements. The statutes are not silent, however. Indeed, elsewhere in Chapter 366 the Legislature *expressly* granted the Commission the authority to approve territorial agreements among electrical utilities. Further, Chapters 364 and 367 provide explicit authority for the Commission to establish the territories in which telephone companies and water and sewer utilities may operate. This seems to us to be compelling evidence that the Legislature in fact did not intend for natural gas utilities to also enjoy exclusive territorial agreements.

City Gas argues that despite the differing statutory language, the territorial agreement was entered into pursuant to a clearly articulated state policy within the first prong of the *Midcal* test, because the Florida Supreme Court interpreted the precise agreement at issue here and concluded the Commission had the authority to approve it. *City Gas Co. v. Peoples Gas Syst.*, 182 So.2d 429 (Fla.1965). Notably, City Gas argued there that this agreement, which Peoples accused it of breaking, should not be enforced, because it violated both the Sherman Act and state antitrust laws. The Florida Supreme Court did not address the potential Sherman Act violation, and held that territorial agreements, with or without Commission approval, did not violate state antitrust laws but were valid under Chapter 366 only with Commission approval. Otherwise, the court reasoned, the territorial agreements would conflict with the Commission's statutory power to require additions and extensions to plants and equipment for service needs.

█ The district court dismissed this decision, concluding that "[s]tate supreme court authority, however, does not form the basis for a clearly articulated state policy except when the court acts in its legislative capacity." 665 F.Supp. at 1530. The district court was incorrect to deem this decision irrelevant because it found the supreme court to be acting in its judicial capacity. This legislative/judicial distinction between decisions of a state supreme court is only meaningful, however, when the issue is whether the conduct in question is that of the State itself, and thus exempt from antitrust liability. *Bates v. State Bar of Arizona*, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977); *Hoover v. Ronwin*, 466 U.S. 558, 104 S.Ct.1989, 80 L.Ed.2d 590 (1984). Then, action by a supreme court only in its legislative capacity is deemed to be that of the State. The clearly articulated test does not come into play except when the conduct of a private actor is challenged. When examining whether private conduct is immune pursuant to a clearly articulated state policy, it is proper to look to state supreme court con-

structions of the relevant statutes. *See, e.g., Consolidated Television Cable Service, Inc. v. City of Frankfort, Ky.*, 857 F.2d 354 (6th Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 1537, 103 L.Ed.2d 842 (1989).

■ The existence of a state decision on the subject does not end the inquiry, however, because the determination of whether the first prong of *Midcal* is satisfied is ultimately a question of *federal* antitrust law. *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 44, 105 S.Ct. 1713, 1719, 85 L.Ed.2d 24 (1985); *Racetrac Petroleum, Inc. v. Prince George's County*, 601 F.Supp. 892, 907 n. 16 (D.Md.1985), *aff'd*, 786 F.2d 202 (4th Cir.1986). The district court here did not rely solely on the statutory language. It also looked to the Commission's own expression of doubt as recently as 1985 as to its authority to establish exclusive territories or to resolve territorial disputes between natural gas utilities. *In re: Tariff filed by Miller Gas*, 85 FPSC 10:205 at 5–6 (October 18, 1985). It also noted that during the initial investigation of this precise agreement at issue here, City Gas contended to the Commission that the agreement was invalid under federal antitrust law and the Commission should not force City Gas to continue to adhere to it. 656 F.Supp. at 1530. In light of the clear statutory grant of exclusive territories for other utilities, the absence of that authority for territorial agreements for natural gas utilities, and the uncertainty with which the Commission has approached these agreements, the district court did not err in concluding that no *clearly* articulated state policy authorized this agreement.

■ Even if the first prong of the *Midcal* test was satisfied, which it was not, the territorial agreement would also have to be actively supervised by the State to qualify for immunity. Active supervision

requires that state officials have and exercise power to review particular anticompetitive acts of private parties and disapprove those that fail to accord with state policy. Absent such a program of supervision, there is no realistic assurance that a private party's anticompetitive conduct promotes state policy, rather than merely the party's individual interests.

*Patrick v. Burget*, 486 U.S. 94, 108 S.Ct. 1658, 1663, 100 L.Ed.2d 83 (1988). That the Commission has expressed doubt about its authority to either establish exclusive agreements or to resolve disputes between natural gas utilities, unlike its express authority to do so for electric utilities, does not demonstrate to this Court that the Commission felt confident it could "disapprove [agreements] that fail to accord with state policy." *Id.* The district court stated there was no evidence that the Commission had created any standards for the creation of territorial agreements or required that they be reviewed on a regular basis. In fact, it appears that this agreement between City Gas and Peoples is the only territorial agreement between natural gas utilities in Florida. The cases dealing with Commission action in connection with *electric* utilities are unpersuasive in light of the explicit statutory authority vested in the Commission to regulate exclusive territories for those utilities.

■ There is no authority to support the argument that judicial review of Commission decisions in this situation supplies the necessary active supervision prong. Simply because the Commission has on occasion, some 15 to 25 years ago, looked at this agreement does not automatically immunize it from federal antitrust scrutiny. The "mere presence of some state involvement or monitoring does not suffice." *Patrick*, 108 S.Ct. at 1663. Rather, the Supreme Court has consistently contemplated a more vigorous, probing supervision than mere acquiescence. This is at bottom an agreement entered into by private parties, in pursuit of their own economic interests, that is neither authorized by the State, nor closely monitored by it. The minimal contact the Commission has had with this agreement is nothing more than a "gauzy cloak of state involvement" which does not protect it from the constraints of federal antitrust regulation. *Midcal*, 445 U.S. at 106, 100 S.Ct. at 943.

The district court found that City Gas abused its power by the following six acts.

1. By agreeing in 1960 with Peoples Gas not to compete with each other in their respective territories in the sale of natural gas.
2. By refusing to sell or transport natural gas to Consolidated at a reasonable price.
3. By attempting to purchase Consolidated and eliminate it as a potential competitor.
4. By acquiring two other small competitors.
5. By intervening in and opposing Consolidated's FERC allocation proceedings seeking permission to sell natural gas.
6. By not charging Consolidated's customers the usual "contribution in aid of construction" to extend service to them in an effort to lure Consolidated's customers away.

The court found that the first three acts were the primary instances of anticompetitive conduct, but stated that the last three, when viewed with the principal acts, further evidenced City Gas' intent to monopolize. These are anticompetitive acts which demonstrate an intent by City Gas to exercise monopoly power. The district court properly held that City Gas was not protected from the antitrust consequences of these acts.

■ City Gas argues that Consolidated obtained a double recovery when the district court ordered both money damages and injunctive relief. The court determined that Consolidated had been damaged in the amount of $1.58 million, a figure representing lost past profits and diminution in value as a going concern as a result of City Gas' anticompetitive conduct. What City Gas objects to is the court setting Consolidated's market value at the level of City Gas' prior purchase offer for Consolidated's assets, arguing that this price represents Consolidated's value as an LP distributor, and not the value of Consolidated as a natural gas retailer. By setting the value in this manner, the court artificially inflated the loss suffered by Consolidated, City

Gas contends. City Gas asserts that because of the injunctive relief, Consolidated will be able to sell natural gas and its present value is thus much more.

There has been no error in the computation of damages. Injunctive relief that became effective in 1988 does not restore Consolidated to the position it would have been in had Consolidated had access to natural gas in 1982, when City Gas engaged in its illegal conduct. In fact, an expert for Consolidated testified that had Consolidated obtained access to natural gas in 1982, its value at trial would have exceeded $2.2 million. The damage award is designed to compensate Consolidated for City Gas' past illegal conduct. By contrast, the injunctive relief is prospective to ensure that City Gas no longer engages in its anticompetitive behavior with Consolidated.

■ City Gas alleged by way of counterclaim that Consolidated, whose owners developed the Bel Aire/Point Royale subdivision through another corporation they headed, engaged in violations of the Sherman and Clayton acts by forcing buyers there to agree to purchase LP gas from it as a condition to buying their homes. The district court first rejected the Clayton Act claim, because the alleged tying arrangement involved land, not a commodity, and so was not governed by the Clayton Act. City Gas does not dispute this finding on appeal.

■ The district court properly rejected the Sherman Act claim finding that City Gas failed to establish that Consolidated had sufficient economic power in the real estate market so as to restrain trade in the gas market. *See Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368, 375 (5th Cir.1977) ("tying violation only if the seller has sufficient economic power with respect to the tying product appreciably to restrain free competition in the market for the tied product.").

The district court did not err when it concluded that City Gas failed to establish that it was injured by any allegedly illegal conduct of Consolidated. Indeed, the

record supports the district court's conclusion that City Gas was never precluded from selling gas in the subdivision, and that once it decided in 1982 that it was feasible to provide service to this area, it immediately extended its pipelines and began soliciting Consolidated's customers. There can be no antitrust violation without injury. *See Amey, Inc. v. Gulf Abstract and Title, Inc.*, 758 F.2d 1486, 1496–97 (11th Cir.1985), *cert. denied*, 475 U.S. 1107, 106 S.Ct. 1513, 89 L.Ed.2d 912 (1986); *Midwestern Waffles, Inc. v. Waffle House, Inc.*, 734 F.2d 705 (11th Cir.1984).

The decision of the district court is AFFIRMED.