[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 01-16064
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
December 20, 2002
THOMAS K. KAHN
CLERK

D. C. Docket No. 00-03414-CV-BBM-1


COVAD COMMUNICATIONS COMPANY,
DIECA COMMUNICATIONS, INC.,
d.b.a. Covad Communications Company,

                                        Plaintiffs-Appellants,

versus

BELLSOUTH CORPORATION,
BELLSOUTH TELECOMMUNICATIONS, INC.,

                                        Defendants-Appellees.


_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(December 20, 2002)**
ON PETITION FOR REHEARING

(Opinion Aug. 2, 2002, 11th Cir., 299 F.3d 1272)

Before EDMONDSON, Chief Judge, TJOFLAT, ANDERSON, BIRCH, BLACK,

CARNES, BARKETT, MARCUS and WILSON, Circuit Judges.[*]

BY THE COURT:

The Court having been polled at the request of one of the members of the Court and a majority of the Circuit Judges who are in regular active service not having voted in favor of it (Rule 35, Federal Rules of Appellate Procedure; Eleventh Circuit Rule 35-5), the Petition for Rehearing En Banc is DENIED.

/s/ J L EDMONDSON
CHIEF JUDGE

---

[*]Judge Dubina and Judge Hull having recused themselves did not participate.

TJOFLAT, Circuit Judge, dissenting from the denial of Rehearing En Banc, in which ANDERSON and BIRCH, Circuit Judges, join:

## I. Background

### A. Telephone Regulation

Not long after Alexander Graham Bell invented the telephone, government regulators sought to deal with the public policy issues inherent in a service that was both considered to be a natural monopoly (due to the economies of scale and network effects of local telephony) and essential for the day-to-day functioning of the American public. Prior to 1996, government regulators operated under the assumption that local exchange carriers (LECs) should not only be rate-regulated, but also quarantined to the business of local telephony. The latter premise was embodied by the consent decree that broke up AT&T. In the government's 1974 antitrust suit against AT&T, the government argued that AT&T (1) discriminated against rivals who needed access to the local loop (such as long distance companies or providers of information services) and (2) engaged in predatory pricing against rivals – a scheme of cross-subsidization that was made more likely by the fact that AT&T simultaneously operated in both regulated/monopolistic and unregulated/competitive markets. See Roger Noll & Bruce Owen, The Anticompetitive Uses of Regulation: United States v. AT&T, in The Antitrust

3

Revolution 290, 295-96 (J. Kwoka & L. White, eds., 1989).  District Judge Harold

Greene approved a consent decree between the government and AT&T in the form

of the Modified Final Judgment (MFJ) entered in 1982.  See United States v. Am.

Tel. & Tel. Co., 522 F. Supp. 131 (D.D.C. 1982), aff'd, 460 U.S. 1001.[1]  Judge

Greene retained jurisdiction over the case, and the Department of Justice promised

to report to court every three years regarding the continuing need for the "line of

business" restrictions.  With the case on his docket for eighteen years, Judge

Greene in effect became the telecommunications czar of the nation.

1996 marked a paradigm change in telephone regulation; competition, not

quarantine, would best advance the public interest.  In that year, Congress passed

monumental legislation, the Telecommunications Act of 1996, Pub. L. 104-104,

110 Stat. 56 (codified at 57 U.S.C. § 151 et seq.).  The legislation aimed to spark

competition in the provision of local telephony.  Congress also hoped to foster

additional competition in telecommunications markets which had, due the MFJ's

line-of-business restrictions, been insulated from competition by very important

competitors – namely, the RHCs.  See Glen Robinson, The Titanic Remembered:

AT&T and the Changing World of Telecommunications, 5 Yale J. on Reg. 517,

---

[1]The MFJ split AT&T's local service into seven Regional Holding Companies (RHCs): U.S. West, Pacific Telesis, Southwestern Bell, Ameritech, Nynex, Bell Atlantic, and BellSouth.  The MFJ also employed various line-of-business restrictions which, for example, precluded the RHCs from providing long distance service or information services.

534-44 (1988). The 1996 Act has three components which are especially noteworthy. First, the Act made an important change in who regulates the telecommunications industry. The Act abolished the MFJ, see Pub. L. 104-104, Title VI, § 601, 110 Stat. 142 (codified at 47 U.S.C. § 152 note),[2] and it delegated to the FCC authority to implement regulations that advance the pro-competition objectives of the Act, see, e.g., 47 U.S.C. § 251 (d)(1).[3] Judge Greene was, in short, replaced by the FCC.[4] Second, the Act substantively changed the way the telecommunications industry is regulated by imposing various obligations on incumbent local exchange carriers (ILECs). These obligations are defined by

---

[2]The provision states:

> Any conduct or activity that was, before the date of enactment of this Act [Feb. 8, 1996], subject to any restriction or obligation imposed by the AT&T Consent Decree shall, on and after such date, be subject to the restrictions and obligations imposed by the Communications Act of 1934 as amended by this Act . . . and shall not be subject to the restrictions and obligations imposed by such Consent Decree.

[3]The statute provides that "[w]ithin 6 months after February 8, 1996, the Commission shall complete all actions necessary to establish regulations to implement the requirements of this section."

[4]As the Seventh Circuit explained:

> Long before the 1996 Act was passed . . . it had become clear that comprehensive regulation of the rapidly advancing telecommunications markets was not a task well suited to the federal courts. Thus, one of the first things Congress did in the 1996 Act was to shift the remaining authority the district court was exercising under the MFJ over to the FCC.

Goldwasser v. Ameritech Corp., 222 F.3d 390, 393 (7th Cir. 2000).

5

section 251,[5] whereas section 252 governs the implementation of the obligations.

Specifically, section 252(a) provides that ILECs and competitive local exchange

carriers (CLECs) can voluntarily enter into interconnection agreements, and

section 252(b) provides that state public service commissions (PSCs) can fashion

an agreement through arbitration in the event that negotiations stall.  The Act thus

contemplates top-down regulation by the FCC, voluntary or arbitrated agreements,[6]

and resolution of post-agreement disputes in the form of contract adjudication.

Section 252 also covers additional matters, such as the grounds PSCs must give in

order to reject an agreement,[7] what happens if a PSC chooses not to make an

approve-or-reject determination at all,[8] and how PSC or FCC decisions can be

---

[5]These include: the duty to negotiate interconnection agreements in good faith; the obligation to interconnect with competitors; the obligation to provide competitors with unbundled access to its network elements ("UNEs") at reasonable rates; the duty to offer for resell at wholesale rates any telecommunications service that the ILEC provides at retail; and the duty to allow collocation of the CLECs' equipment on the ILEC's premises.  See 47 U.S.C. § 251(c).  The 1996 Act thus envisions "three entry options: entry through resale, entry through pure facilities-based competition, and entry via the purchase of unbundled network elements."  Stuart Benjamin, Douglas Lichtman, & Howard Shelanski, Telecommunications Law and Policy 718 (2001).

[6]There are thousands of existing agreements throughout the United States, and over 400 in BellSouth's territory.

[7]Section 252(e)(2) allows state commissions to reject an interconnection agreement only if the agreement discriminates against a third-party CLEC or is inconsistent with "the public interest, convenience, and necessity."

[8]Section 252(e)(5) instructs the FCC to act in the event of a PSC default.

appealed to a federal court.[9]  The final component of the Act is the removal of the line-of-business restrictions.  Some restrictions, for example, sunset automatically. See, e.g., 47 U.S.C. § 275 (precluding RBOC[10] entry into the alarm monitoring business until 2001).  Others are removed only after ILECs prove that they have fulfilled their obligations under the 1996 Act.  See 47 U.S.C. § 271(c)(2)(B) (establishing a fourteen-point "competitive checklist" that RBOCs must meet before they may offer in-region long distance service.).

B.  This Dispute

Covad is the CLEC in this case; BellSouth is the ILEC.  Covad is in the business of providing DSL service[11] – primarily through the use of BellSouth's physical plant.  BellSouth and Covad entered into an interconnection agreement –

---

[9]Section 252(e)(6), governing federal review of PSCs, provides that "any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement . . . meets the requirements of section 251 of this title and this section." There is no special review statute for the FCC, which is therefore reviewed by the courts of appeals pursuant to 28 U.S.C. § 2344.

[10]"RBOC" is an acronym for "Regional Bell Operating Company."  RBOCs were the subdivisions of AT&T that provided local service throughout the nation prior to the MFJ.  Under the MFJ, each RHC consisted of several RBOCs.

[11]"DSL" stands for "digital subscriber line."  DSL is "a high-speed data service provided over conventional telephone networks.  DSL refers to the technology that allows telephone carriers to attach certain electronics to the telephone line that can transform the copper loop that already provides voice service into a conduit for high-speed data traffic."  See Stuart Benjamin, Douglas Lichtman, & Howard Shelanksi, Telecommunications Law and Policy 1048 (2001).

7

ultimately approved by the Georgia PSC – pursuant to 47 U.S.C. § 252. Covad claims that BellSouth has not fulfilled its obligations under the 1996 Act and the BellSouth/Covad interconnection agreement. Specifically, Covad argues the following: BellSouth should have provided UNEs more promptly; BellSouth did not sufficiently provide space so that Covad could "collocate" its equipment on BellSouth's premises; BellSouth engaged in a "price squeeze" by pricing its UNEs too high while selling its DSL services to consumers at retail prices that are too low;[12] and BellSouth understaffed its wholesale division. The basic theory, then, is that Covad needs BellSouth's local loop to compete, and BellSouth has done a poor job of turning it over. Covad wants access, and it wants access more promptly and on less costly terms than BellSouth presently provides.[13]

---

[12]A "price squeeze" claim is premised upon an illegal wholesale/retail differential. For example, Covad states in its complaint that BellSouth's retail prices "are set so low related to its unbundled wholesale loop prices that Covad cannot meet BellSouth's wholesale or retail prices and still make a reasonable return on investment."

[13]Covad's complaint contains twenty-three causes of action. Count one seeks relief under section 2 of the Sherman Act pursuant to the "essential facilities doctrine." Count two seeks the same relief under section 2 of the Sherman Act based upon BellSouth's alleged "monopolization." Count three seeks the same relief under section 2 of the Sherman Act based upon BellSouth's alleged "attempted monopolization." All of the section 2 allegations are thus folded into count 3. Counts six, seven nine, ten, thirteen, fourteen, sixteen, seventeen, nineteen, twenty, twenty-two, and twenty-three replicate counts two and three under the laws of the following states: Alabama, Florida, Kentucky, Louisiana, North Carolina, and Tennessee. Counts eight, eleven, twelve, fifteen, eighteen, and twenty-one allege that BellSouth interfered with business relations in violation of the laws of the same six states. Count four is a claim for breach of contract. Finally, count five asserts a cause of action directly under the Telecommunications Act of 1996. In the "prayer for relief" at the end of its complaint, Covad asks for treble damages on its antitrust claims, punitive damages on its state law tort claims,

The district court granted a dismissal, pursuant to Fed. R. Civ. P. 12(b)(6), based upon the reasoning of the Seventh Circuit in Goldwasser v. Ameritech Corp., 222 F.3d 390 (7th Cir. 2000).  A three-judge panel of this Court reversed, concluding that the obligations of ILECs under the 1996 Act and the Sherman Act are essentially coterminous, and therefore Covad's complaint alleges harms that, if proved, are cognizable under the antitrust laws.  See Covad Communications Co. v. BellSouth Corp., 229 F.3d 1271 (11th Cir. 2002).  Specifically, the panel found that BellSouth's alleged failure to promptly turn over its network would, if proved, give rise to liability under the essential facilities doctrine and the refusal-to-deal doctrine.  The panel also held that BellSouth's allegedly high wholesale prices for its DSL UNEs, in conjunction with low retail prices on DSL service, states a "price squeeze" claim under Section 2 of the Sherman Act.  This court declined to reconsider the panel's decision en banc.  I dissent because the panel's holding has troubling implications for telecommunications law and, indeed, antitrust law as a whole.  The panel decision took a turn that is bad policy, undermines Congress's regulatory scheme, and usurps regulatory power that belongs to the FCC under the 1996 Act by placing it in the hands of federal courts.

compensatory damages on the remaining claims, and "such other and further relief as the Court deems just and proper."  One must assume that the latter relief would include injunctive orders necessary to ensure BellSouth's compliance with the antitrust laws, the 1996 Act, and the parties' interconnection agreement.

9

C. Overview

In part II of this opinion, I explain why the duty Covad seeks to impose –
namely, the duty to help one's competitor – is required by the 1996 Act but not the
antitrust laws. This proposition is supported by traditional antitrust doctrine and
the fact that antitrust suits premised upon forced-access obligations would flout the
intent of Congress. On the latter point, I explain how an overlap between the
antitrust laws and the 1996 Act would make the 1996 Act's scheme of post-
agreement dispute resolution a nullity and would put federal judges back into the
regulatory mix, micromanaging telecommunications firms far beyond what Judge
Greene could have imagined. Part III examines the panel's holding regarding
Covad's "price squeeze" claim, concluding that Covad's allegations fail to state a
claim under the antitrust laws. This part also explains how the panel's "price
squeeze" holding will harm consumers and impede the rollout of broadband
Internet access, resulting in considerable tension with FCC policy. Part IV
concludes.


II. The Duty of a Monopolist to Help its Competitors is an Extraordiary Obligation
Imposed by the Telecommunications Act of 1996, but not the Antitrust Laws

The panel apparently believes that the 1996 Act's unbundling and
interconnection obligations are coterminous with the duties of a monopolist under

10

the antitrust laws.  I disagree.  Rather, as the Seventh Circuit held in <u>Goldwasser v.</u>

<u>Ameritech Corp.</u>, 222 F.3d 390 (7th Cir. 2000), the 1996 Act imposes additional

obligations above and beyond what is required under the antitrust laws.[14]  I reach

this conclusion for two reasons: (1) antitrust doctrine has not (at least until now)

ever required the sort of forced-access requirements sought by the plaintiff and (2)

suits premised upon a forced-access regime under the antitrust laws would flout the

intent of Congress.

A.  Traditional Antitrust Doctrine Regarding Forced Access

    *1.  The Essential Facilities Doctrine*

---

[14]The Seventh Circuit clearly articulated what the world would have looked like if, counterfactually, Congress had opted to choose a "simple antitrust solution" rather than the extraordinary obligations placed upon ILECs:

> It would have been possible for Congress to have passed a statute that simply lifted the regulatory prohibitions found in sources such as the Telecommunications Act of 1934, the MFJ, and other sources, that barred companies in different parts of the telecommunications market (i.e. long distance and local markets, generally speaking) from entering one another's domains. Anyone who wanted to compete with an ILEC would have had the burden of duplicating its physical infrastructure or of persuading the ILEC to contract with it on mutually satisfactory terms, but this is the normal way in which competitive markets work . . . .
>
>     In other words, Congress could have chosen a simple antitrust solution to the problem of restricted competition in local telephone markets.  It did not.  Instead, in an effort to jump-start the development of competitive local markets, it imposed a host of special duties on the ILECs; it entrusted supervision of those duties to the FCC and the state public utility commissions; and it created a system of negotiated agreements through which this would be accomplished.  These are precisely the kinds of affirmative duties to help one's competitors that we have already noted do not exist under the unadorned antitrust laws.

<u>Goldwasser</u>, 222 F.3d at 399-400 (citations omitted).

11

Antitrust doctrine has never required the extensive, court-administered forced-access regime that the panel opinion contemplates in its holding regarding the so-called "essential facilities" doctrine.[15]  Antitrust law generally poses no obligation upon firms to deal with competitors or share their capital investments with rivals.  See, e.g., Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 600-01, 105 S. Ct. 2847, 2856, 86 L. Ed. 2d 467 (1985) ("[E]ven a firm with monopoly power has no general duty to engage in a joint marketing program with a competitor. . . .  The absence of a duty to transact business with another firm is, in some respects, merely the counterpart of the independent businessman's cherished right to select his customers and his associates."); see generally 3A Phillip Areeda &  Herbert Hovenkamp, Antitrust Law, ¶ 771b (1996) ("Forcing a firm to share its monopoly is inconsistent with antitrust's basic goals . . . .").  This is so for several reasons.  The first reason is the fear that new entrants will not build their own physical plant if they can simply piggyback on the facilities of an incumbent; there is hardly meaningful competition without facilities-based competition.  A second problem with a broad expansion of the essential facilities

_____

[15]The panel, citing MCI Communications v. Am. Tel. & Tel., 708 F.2d 1081, 1132-33 (7th Cir. 1983), held that there are four elements to a claim under the essential facilities doctrine: (1) control of the essential facility by a monopolist; (2) a competitor's inability practically or reasonably to duplicate the essential facility; (3) the denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility.  Covad, 229 F.3d at 1286.  The panel never mentioned the horizontal/vertical distinction that I discuss, infra.

12

doctrine is that it would place trial courts in the role of quasi-regulatory agencies because they would have to oversee sharing between rivals.  Third, the doctrine creates a disincentive to develop new technologies.  If a competitor can simply utilize a court order to get access to an incumbent's physical plant, there is less incentive to create new technologies (such as wireless telephony) to bypass the perceived "essential facility."  Finally, the doctrine creates little incentive for incumbents to roll out additional plant or upgrade existing facilities.  Why bare all of the risk, only to have competitors reap the benefits?  In sum, there are convincing reasons why the leading antitrust scholars condemn the essential facilities doctrine, and why they are steadfast in their argument that the Supreme Court has never explicitly endorsed the doctrine.  See id. at ¶¶ 771b-c ("The Supreme Court has never articulated or approved the modern version of the essential facilities doctrine.").

The panel relied on two cases to support its expansive view of the essential facilities doctrine.  The first is Consolidated Gas Co. of Fla., Inc. v. City Gas Co. of Fla., 880 F.2d 297, 301 (11th Cir. 1989), on reh'g en banc, 912 F.2d 1262 (11th Cir. 1990), vacated and remanded, 499 U.S. 915 (1991), on remand, 931 F.2d 710 (11th Cir. 1991).  That case was wrong because it failed to grasp a fundamental point: to the extent that the essential facilities doctrine is viable at all, it is a

13

doctrine concerned with vertical foreclosure. The leading antitrust scholars confirm this view: "It should be clear from the outset that the essential facility doctrine concerns vertical integration – in particular, the duty of a vertically integrated monopolist to share some input in a vertically related market, which we call market #1, with someone operating in an upstream or downstream market, which we call market #2." See 3A Areeda & Hovenkamp, Antitrust Law ¶ 771a; see also Consolidated Gas, 912 F.2d at 1291-92 (Tjoflat, C.J., dissenting) (arguing that the defendant's refusal to deal was justified on the basis that it was not a wholesaler, but rather a retailer similar to the plaintiff/competitor). Indeed, Covad concedes that my dissenting opinion was correct. See Covad Br. at 27 n.14. In this case, BellSouth was in the business of providing DSL services via its local loop. Covad is similarly in the business of DSL provision (via BellSouth's local loop). The two entities are thus horizontal competitors. Moreover, Covad does not want merely to interconnect its own facilities with BellSouth's network; it wants the facilities of BellSouth so that it can sell DSL services. The 1996 Act imposes this novel obligation; the antitrust laws do not. A reading of the essential facilities doctrine that stands for the proposed proposition – namely, that horizontal competitors that find it financially inconvenient to build their own physical plant

14

may simply tap the resources of the incumbent/monopolist or else sue for treble damages – is a dangerous expansion of the antitrust laws indeed.[16]

The Seventh Circuit decision in MCI Communications v. AT&T Tel. & Tel. Co., 708 F.2d 1081, 1132 (7th Cir. 1983), makes this point clear (although the Covad panel somehow uses that case to support its position). In that case, the court held that there was no liability for AT&T's failure to provide access to its long-distance network. It was only in the vertical context that the essential facilities doctrine was implicated: MCI was entitled to interconnect its *long distance* network with AT&T's *local* exchanges. The court held that because MCI was seeking to compete with AT&T in the long-distance market, it was not entitled to rely on AT&T's existing long-distance facilities to enhance its ability to compete. As the Seventh Circuit later stated: "AT&T's refusal to voluntarily assume 'the extraordinary obligation to fill in the gaps in its competitor's network,' did not suffice to support a finding that it was trying to maintain its monopoly of long-

---

[16]We rejected a similar claim in another case:

> This argument reveals the heart of the plaintiffs' claim: they want the right to benefit from [the defendant's] economies of scale. The plaintiffs are seeking a "free ride" – since they do not have a large enough operation to produce significant economies of scale and are unable, or unwilling, to finance the growth necessary to achieve these economies, they want to use, to their benefit, [the defendant's] size and the capital outlays used to achieve it . . . .
>
> The plaintiffs then are asking us to equip them with [the defendant's] competitive advantage. This is not a function of the antitrust laws. The antitrust laws are not intended to support artificially firms that cannot effectively compete on their own.

Seagood Trading Corp. v. Jerrico, Inc., 924 F.2d 1555, 1572-73 (11th Cir. 1991).

15

distance telephone service by anticompetitive means." State of Ill., ex. rel. Burris v. Panhandle E. Pipe Line Co., 935 F.2d 1469, 1484 (7th Cir. 1991) (quoting MCI, 708 F.2d at 1149). The MCI court held that "as pure matter of antitrust law . . . we decline to hold AT&T liable for a refusal to make available its full nationwide network to a competitor." MCI, 708 F.2d at 1149. The analogy between MCI and AT&T's long-distance division is similar to the analogy between BellSouth and Covad: each is a horizontal competitor of the other. Accordingly, the same result should obtain: the essential facilities doctrine should not be used to give the horizontal competitor access.

The essential facilities doctrine should not be applied in Covad for another reason. Covad seeks to force BellSouth to make extensive modifications to its network to accommodate Covad. See Plaintiff's Complaint, R1-1, ¶¶66, 70, 88 (complaining that BellSouth failed to provide a transport line, to "develop[] automated electronic interfaces," and "to develop any mechanism by which Covad can offer an existing BellSouth ADSL customer a seamless transfer to Covad."). The antitrust laws do not require this. See 3A Areeda & Hovenkamp, Antitrust Law ¶773e, at 214 ("No case has suggested that the monopolist must build new capacity to satisfy a would-be sharer."). The 1996 Act may require such alterations, but that is another matter. The antitrust laws do not require BellSouth

16

to promptly develop software and modify its facilities in order to meet Covad's business needs.  Nor do the antitrust laws require, as Covad complains, that BellSouth add personnel to its wholesale division in order to meet BellSouth's regulatory obligations.

### 2. The Refusal-to-deal Doctrine

The refusal-to-deal doctrine is unavailing for the same reasons that its cousin, the essential facilities doctrine, is unavailing.  Because this doctrine of forced-access is used for the same purpose as the essential facilities doctrine, all of the problems discussed above apply.  If one persists on using a different analytical hat for essentially the same conduct, however, none of the refusal-to-deal cases countenance the bold extension proffered by the panel.  The touchstone refusal-to-deal case is the much-criticized Aspen Skiing, supra.   Liability was imposed in that case because the defendant terminated a mutually beneficial, pre-existing business arrangement.  The case hinged on the fact that Aspen did not engage in "competition in the merits"; rather, it chose to forego "short-run benefits and consumer goodwill in exchange for a perceived long-run impact on its smaller rival." Aspen Skiing, 474 U.S. at 610-11, 105 S. Ct. at 2861.  In this case, there was no preexisting business arrangement that BellSouth once thought to be mutually beneficial.  Moreover, Covad cannot possibly claim that the obligation it

17

seeks to impose with the antitrust laws – forced sharing – serves BellSouth's interests. Its decision not to share is perfectly legitimate competition on the merits.

B. The Undermining of the 1996 Act

The position taken by the panel – namely, that the 1996 Act does not require obligations above and beyond those required by the antitrust laws but rather overlaps with the antitrust laws – results in a regulatory scheme that is in considerable tension with the regulatory scheme envisioned by Congress. First, the panel's holding makes the 1996 Act's post-agreement enforcement scheme a nullity. This is because breach-of-contract claims would become secondary to antitrust claims, and the contract claims would be adjudicated under the supplemental jurisdiction of federal district courts (rather than by state courts or PSCs). Why would a CLEC ever sue only in contract when it can jettison the regulatory scheme and sue for treble damages in federal court? After all, ILECS are all monopolists, and virtually anything they do that breaches an interconnection agreement can be the subject of an antitrust suit under the theory that the breach is done to protect the ILEC's market position.[17] On this point, I agree with the

---

[17]The panel maintained that before a complaint can pass Rule 12(b)(6) muster, it must allege more than monopoly power and breach of contract; it must also allege that the defendant engaged in conduct "with an intent to monopolize." I cannot think of a situation, however, in which an ILEC would be liable in breach and yet a creative plaintiff's lawyer could not also

18

Seventh Circuit that "[t]he elaborate system of negotiated agreements and enforcement established by the 1996 Act would be brushed aside by any unsatisfied party with the simple filing of an antitrust action." See Goldwasser, 222 F.3d 390, 400-01 (7th Cir. 2000).

Second, the panel's holding undermines Congress's efforts to place regulatory authority in the hands of the FCC – an expert agency – rather than the courts. Prior to the panel's decision, the FCC (and, to some extent, PSCs) had exclusive authority to implement the 1996 Act's interconnection and unbundling requirements. If the panel is correct in its conclusion that Covad has made out an antitrust claim under the essential facilities doctrine, will federal district courts issue injunctions[18] requiring ILECs to undertake obligations above and beyond those required by the 1996 Act? Even if district courts refrain from issuing forced-access injunctions (with their concomitant price terms) under the theory that regulatory bodies have already been established to set interconnection terms and UNE rates, courts will no doubt enjoin ILECs from engaging in future anticompetitive behavior. And since the claims of anticompetitive conduct made

allege that the breach was made with an eye toward benefitting the ILEC and thus preserving the ILEC's position in the relevant market.

[18]Covad did not specifically ask for injunctive relief in is complaint, although it requested "[s]uch other relief as the Court deems just and proper."

19

by CLECs will essentially track the many contractual obligations that ILECs must undertake pursuant to their interconnection agreements,[19] the district courts will essentially oversee ILEC compliance under their contempt power. For every alleged violation of an interconnection agreement, the ILEC will have to show cause why it should not be held in contempt and sanctioned. Thus, the federal courts will be charged with closely monitoring ILEC compliance with the many requirements of the ILEC/CLEC interconnection agreements. This was not what Congress envisioned when it replaced Judge Greene with the FCC.

## III. Price Squeeze

The panel's holding that Covad's "price squeeze" claim is cognizable under the antitrust laws is suspect because, as the district court noted, there is no allegation that BellSouth set below-cost retail prices for its DSL services. The wholesale prices that BellSouth charges are set by state commissions or by voluntary agreement; that is, a CLEC either agrees to the wholesale price and cannot be heard to complain, or else the wholesale rate is nondiscretionary. Covad has a remedy for its claim that the state commission set a wholesale rate that was

---

[19]In this case, for example, the alleged anticompetitive acts of BellSouth could easily be mistaken for breaches of the Covad/BellSouth interconnection agreement.

too high: judicial review under 47 U.S.C. § 252(e)(6).[20]  It cannot acquiesce in the state commission's wholesale rate and turn around and sue BellSouth because BellSouth is not charging consumers enough at retail.  See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 223, 113 S. Ct. 2578, 2588, 125 L. Ed. 2d 168 (1993) (rejecting "the notion that above-cost prices that are below . . . the costs of a firm's competitors inflict injury to competition cognizable under the antitrust laws.").  If the district court grants injunctive relief, will it order BellSouth to charge Covad a wholesale price that is lower than that set by the state commission?  Will it order BellSouth to charge DSL customers a price that is higher than the present price (even though the present price is presumably above cost)?  Assuming Covad's allegations are true, what should BellSouth have charged DSL customers in hindsight?  I can think of nothing more antithetical to the consumer welfare aims of antitrust law, and to FCC efforts to hasten the rollout of broadband services, than to send the message that ILECs should charge DSL customers prices that are not only above cost, but *substantially* above cost so that CLECs can have large profit margins.  There is nothing "factual" about this claim

_____

[20]This is true if the BellSouth/Covad agreement was the product of arbitration before the PSC.  It is unclear from the complaint whether the agreement was voluntary or arbitrated.

21

that must await summary judgment.  The law simply does not recognize the alleged

facts as an actionable price squeeze.

IV.  Conclusion

Much more could be said about the panel opinion, such as (1) when it was

issued, two of the key decisions it relied on (BellSouth[21] and Consolidated Gas) had

been vacated; (2) the panel set up a straw man with its belabored argument in

support of the unexceptional proposition that "in enacting the 1996 Act, Congress

did not explicitly supersede the salience of the antitrust laws in the

telecommunications industry,"[22]  Covad, 299 F.3d at 1280; and (3) the decision will

_____

[21]See BellSouth Telecomm., Inc. v. MCImetro Access Transmission Servs. Inc., 278 F.3d 1223
(11th Cir. 2002).

[22]The panel made this argument in the context of its discussion of the 1996 Act's antitrust
savings clause.  See Telecommunications Act of 1996 § 601(b)(1), codified at 47 U.S.C. § 152
note ("[N]othing in this Act or the amendments made by this Act shall be construed to modify,
impair, or supersede the applicability of the antitrust laws.").  No one has ever contended that "in
enacting the 1996 Act, Congress did not explicitly supersede the salience of the antitrust laws in
the telecommunications industry."  Judge Wood of the Seventh Circuit, who is a former antitrust
professor and high-ranking attorney with the U.S. Department of Justice Antitrust Division,
never made that argument.  Neither do I.  Rather, we contend that the 1996 Act established a
regulatory scheme that went beyond anything required by the antitrust laws.  It is likely that
Congress perceived the 1996 Act as imposing *additional* obligations, and that Congress therefore
wanted to bring home the point that pre-1996 obligations under the antitrust laws continue to
have vitality in the post-1996 world.  The panel, on the other hand, evidently believes that the
1996 Act is merely a more specific application of the forced-accessed requirements that
ordinarily would be required by the antitrust laws.

22

trigger an avalanche of complex litigation in the district courts.[23]  I stop with the antitrust issues, however, because that is where the panel opinion wreaks the most havoc on the law.  First, the decision thwarts Congress's chosen regulatory scheme.  In the states of Florida, Georgia, and Alabama, CLECs will have no incentive to use the post-agreement enforcement process envisioned by the 1996 Act.  From now on they will simply run to federal court, seeking treble damages and injunctions that are potentially inconsistent with the 1996 Act's requirements.[24]  Along the way, regulation of the telecommunications industry will shift from the FCC back to the federal courts.   Although Judge Greene may not have had the expertise of the FCC, at least the public law litigation he presided over involved a single monopolist (AT&T) and the government rather than what will ensue in the wake of the panel's

---

[23]This proposition stems from several observations.  First, there are thousands of interconnection agreements and thus potentially thousands of Covad-like antitrust cases lurking across the Circuit (and, indeed, the United States).  Second, many parties will be involved in the litigation.  In Goldwasser, for example, consumers (not CLECs) were the plaintiffs.  There might well be multiple consumer class actions in future cases.  Moreover, the panel's "price squeeze" holding, which will compel BellSouth to raise the retail price of its DSL service, will affect existing contracts.  DSL customers must therefore be joined as indispensable parties – possibly in the form of another class action.  If one adds to this picture the problem of apportioning damages, see, e.g., Todorav v. DCH Healthcare Auth., 921 F.2d 1438, 1451-52 (11th Cir. 1991), and the issue of state court proceedings (which obviously cannot be consolidated), then the drain on scarce judicial resources becomes apparent.  I do not suggest that otherwise meritorious lawsuits should be dismissed merely because their complexity will drain judicial resources; rather, I contend that the drain ought to at least provoke a second look as to whether these suits are really meritorious in the first place.

[24]CLECs also have an incentive to delay the negotiation of interconnection agreements, for any damages CLECs sustain because of an ILEC's failure to yield access to its network will potentially be subject to trebling by a district judge.

23

ruling: multiple private disputes. And at least at the time of the AT&T litigation, Congress had not explicitly chosen to vest the FCC with the regulatory authority assumed by Judge Greene. The panel thus undermines the wishes of Congress – first by getting the federal courts into the business of micromanaging ILEC compliance with interconnection agreements, and second by enabling CLECs to sidestep the 1996 Act's regulatory scheme with the filing of antitrust suits.

The panel also embarked upon a new journey in antitrust law, the likes of which have not been seen since the inconsistent and discredited antitrust jurisprudence of the Warren Court era embodied by cases such as Brown Shoe Co. v. United States, 370 U.S. 294, 320, 82 S. Ct. 1502, 1521, 8 L. Ed. 2d 510 (1962) ("It is competition, not competitors, which the Act protects. But we cannot fail to recognize Congress' desire to promote competition through the protection of viable, small, locally owned businesses. Congress appreciated that occasional higher costs and prices might result from the maintenance of fragmented industries and markets. It resolved these competing considerations in favor of decentralization."). See generally Robert Bork, The Antitrust Paradox: A Policy at War With Itself (rev. ed. 1993). The panel's novel extension of the essential facilities doctrine, for example, will enable any new entrant to tap the assets of its (monopolistic) horizontal competitor if the assets are "essential" for the new entrant to compete. This broad

24

principle has never been the law. In the same vein, the panel decision will force ILECs to raise the retail prices of DSL services or else face "price squeeze" claims – even if the ILEC already prices its DSL services above cost and even though the FCC has been eager to hasten deployment of broadband technology rather than decrease it.

The aftershocks of the panel opinion well be felt far beyond the telecommunications industry. Are all firms that traditionally have been thought to be natural monopolies, such as pipeline companies and energy producers, now supposed to let competitors resell their assets, with the incumbent monopolists having the additional duty to charge their customers a price that is high enough so that new entrants can have hefty profit margins? After all, the panel purported to apply general principles of antitrust law to the facts of the case; there is nothing that is telecom-specific in its holding.

Rule 35(b) of the Federal Rules of Appellate Procedure instructs that cases to be heard en banc are those which "present a question of exceptional importance." The panel decision – traveling on an Eleventh Circuit essential facilities case that has been vacated by the Supreme Court – departs from settled antitrust doctrine, undermines the operation of 1996 Act, and invites the filing of hundreds of complex

cases in the district courts throughout the circuit.[25]  This case is extremely important.  Accordingly, I am compelled to dissent from the court's failure to reconsider the case en banc.

---

[25]  I suggest that CLECs filing suit against BellSouth in the district courts of the Fourth, Fifth, and Sixth Circuits may invoke the doctrine of collateral estoppel in response to BellSouth's argument that federal antitrust claims such as those Covad presents in this case are not cognizable under section 2 of the Sherman Act.  In short, the panel's decision is not only of "exceptional importance" in the Eleventh Circuit, it will be of importance to the courts and litigants in these other circuits as well.